NOT YET SCHEDULED FOR ORAL ARGUMENT
_____
NO. 23-7135
_____
IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

JANE DOE, BY AND THROUGH HER NEXT FRIEND, JULIE DOE;
JULIE DOE, MOTHER AND NEXT FRIEND OF JANE DOE,
PLAINTIFFS - APPELLANTS,
V.
DISTRICT OF COLUMBIA; AQUEELHA JAMES, INDIVIDUALLY
AND AS AN AGENT OF DISTRICT OF COLUMBIA,
DEFENDANTS - APPELLEES.
_____


ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
AMY BERMAN JACKSON, U.S. SENIOR DISTRICT JUDGE
CASE NO. 1:18-CV-02181-ABJ
_____

**BRIEF FOR APPELLANT**
_____


Kasey K. Murray
KOONZ MCKENNEY JOHNSON
 & DEPAOLIS LLP
2001 Pennsylvania Avenue, N.W.
Suite 530
Washington, D.C. 20006
(202) 659-5500
kmurray@koonz.com

*Counsel for Appellant*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

A.  *Parties and amici*.  Jane Doe, by her next friend Julie Doe, was the plaintiff in the district court and is the appellant in this Court.  The District of Columbia and Aqueelha James were the defendants in the district court and are the appellees in this Court.  No intervenors or amici appeared before the district court and none have appeared in this Court.

B.  *Rulings under review*.  Jane Doe appeals from the following rulings in the district court (Jackson, J.):  (1) The minute order entered on September 24, 2019 dismissing counts 3, 5, 6, and 7 of Plaintiff's Complaint (*see* Appendix ("A.") 42); and (2) the Order and Memorandum Opinion entered on September 14, 2023 granting Defendants' Motions for Summary Judgment  (A. 1123-1165 (the opinion of which can be found on Westlaw at 2023 WL 5974473)).

C.  *Related cases*.  This case has not been before this Court or any other court other than the district court below.  Undersigned counsel is unaware of any related cases pending in this Court or any other court.

# Table of Contents

Certificate as to Parties, Rulings, and Related Cases ................................................. i

Table of Authorities ..................................................................................................v

Glossary of Abbreviations ................................................................................... viii

Statement of Jurisdiction..........................................................................................1

Statement of the Issues.............................................................................................2

Statutes and Regulations ..........................................................................................4

Statement of the Case...............................................................................................4

Statement of the Facts ..............................................................................................5

I.      Jane Doe Was Sexually Assaulted at RHS on June 13, 2017 ........................5

II.     The District Failed to Provide Title IX Training to RHS
        Administrators, Personnel, and Students..........................................................6

III.    James's Response to Jane Doe's Report of Sexual Assault ...........................7

IV.     The District Ignored Jane's Title IX Civil Rights ..........................................9

V.      The District Denied Jane a "Victim Transfer" to Another School...............11

VI.     James Misrepresented the Sexual Assault to the District..............................13

VII.    The District Did Not Discipline M.P...........................................................16

VIII.   The District Took Punitive Actions against Jane .........................................16

        A.      Sophomore Year, 2017-2018 ..............................................................16

        B.      Junior Year, 2018-2019......................................................................18

        C.      Senior Year, 2019-2020 .....................................................................21

IX.     Appellees Caused Jane to Suffer Emotional and Psychological Injuries......22

Standards of Review ...............................................................22

Summary of Argument ...........................................................23

Argument ...............................................................................28

1.      The district court's dismissal of Jane's Title IX claim because she did not adduce evidence sufficient to show that the District acted with deliberate indifference in response to her report of sexual assault was based on a truncated weighing of the factual record in a light that was favorable to the District. This was in contravention of the standard of review at summary judgment and not in accordance with *Davis* and its progeny. ...................................................................................28

2.      The district court's conclusion that Jane did not present evidence sufficient to prove her retaliation claim likewise ignored salient facts in the record and drew inferences from the facts considered in favor of the non-movant in contravention of the summary judgment standard.........36

3.      The district court's rationale for dismissing Jane's intentional infliction of emotional distress claim is based on legal error and an incomplete version of the record because Jane was entitled to an inference that James's conduct towards her was intentional or reckless based upon the outrageousness of James's conduct.  When correctly applied, Jane has presented ample evidence that James acted with intentional or reckless disregard towards her................................40

4.      The district court erred in granting the Defendants' motions to dismiss as to Jane's claim of negligent infliction of emotional distress when it found that she had not pled a special relationship between herself and the Defendants. But Jane did plead a special relationship with Defendants along with facts sufficient to find that the Defendants did undertake an investigation of Jane's report of sexual assault, and accordingly, owed Jane a duty of reasonable care in carrying out that investigation................................................................................49

Conclusion   ...........................................................................55

Certificate of Service ................................................................................56

Certificate of Compliance ........................................................................56

Statutory Addendum

# Table of Authorities

**CASES**

*Allen v. Johnson,*
    795 F.3d 34 (D.C. Cir. 2015)................................................................37

*Burlington N. & Santa Fe Ry. Co. v. White,*
    548 U.S. 53 (2006)..........................................................................37

*Bushrod v. Dist. of Columbia,*
    521 F. Supp. 3d 1 (D.D.C. 2021).....................................................40,41

*Cavalier v. Catholic Univ. of Am.,*
    306 F. Supp. 3d 9 (D.D.C. 2018).............................................30, 37, 53

*Contreras v. Crown Zellerbach Corp.,*
    565 P.2d 1173 (1977).......................................................................42

*Crawford v. Duke,*
    867 F.3d 103 (D.C. Cir. 2017)............................................................23

*Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.,*
    77 F.4th 679 (D.C. Cir. 2023).......................................................22, 23

*\*Davis v. Monroe Cnty. Bd. of Educ.,*
    526 U.S. 629 (1999)...........................................................28, 29, 30, 34

*District of Columbia v. Royal,*
    465 A.2d 367 (D.C. 1983) .............................................................50, 53

*District of Columbia v. Tulin,*
    994 A.2d 788 (D.C. 2010) ............................................................40, 41

*Doe v. Bibb Cty. Sch. Dist.,*
    126 F. Supp. 3d 1366 (M.D. Ga. 2015),
    *aff'd* 688 F. App'x 791 (11th Cir. 2017) .................................30, 34, 35

*\*Doe v. Fairfax Cty. Sch. Bd.,*
    1 F.4th 257 (4th Cir. 2021) ........................................................29, 30, 34

*Doe v. Manor College,*
479 F.Supp.3d 151 (E.D. Pa. 2020) ....................................................37

*Doe v. Sch. Bd. of Broward Cty.,*
604 F.3d 1248 (11th Cir. 2010) ........................................................38

*\*Drejza v. Vaccaro,*
650 A.2d 1308 (D.C. 1994) ..................................................44, 45, 46

*Fitzgerald v. Barnstable Sch. Comm.,*
504 F.3d 165 (1st Cir. 2007),
*rev'd and remanded on other grounds*, 555 U.S. 246 (2009) ......................30, 34

*\*Gebser v. Lago Vista Indep. Sch. Dist.,*
524 U.S. 274 (1998).........................................................24, 28, 29, 30

*\*Hedgepeth v. Whitman Walker Clinici*
22 A.3d 789  (D.C. 2011)  ..................................................49, 50, 53

*\*Jackson v. Birmingham Bd. of Educ.,*
544 U.S. 167 (2005).............................................................36

*Kaiser v. United States,*
761 F.Supp. 150 (D.C. Cir. 1991).................................................42

*Karasek v. Regents of the Univ. of Cal.,*
2016 WL 4036104 (N.D. Cal. July 28, 2016) ..................................30

*King v. Jackson,*
487 F.3d 970 (D.C. Cir. 2007).........................................................23

*King v. Kidd*,
640 A.2d 656 (D.C. 1993)……………..………………………………42, 43

*Kowalevicz v. United States,*
302 F. Supp. 3d 68 (D.D.C. 2018)....................................................40

*Larijani v. Georgetown University,*
791 A.2d 41 (D.C. 2002) ....................................................40

*Pitt v. District of Columbia,*
  491 F.3d 494 (D.C. Cir. 2007) .............................................................40

*Sibley v. St. Albans School,*
  134 A.3d 789 (D.C. 2016) ...........................................27, 51, 52, 53

*\*Waldon v. Covington,*
  415 A.2d 1070 (D.C. 1980) ......................................................40, 41

*Williams v. Baker,*
  572 A.2d 1062 (D.C. 1990) ...............................................................50

*Williams v. Bd. of Regents of Univ. Sys. of Georgia,*
  477 F.3d 1282, (11th Cir. 2007) .................................................30, 34

## STATUTES

*20 U.S.C. § 1681(a) ........................................................................2, 28

28 U.S.C. § 1291.................................................................................1

28 U.S.C. § 1331.................................................................................1

28 U.S.C. § 1367.................................................................................1

28 U.S.C. § 1343(a)(3).........................................................................1

28 U.S.C. § 1343(a)(4).........................................................................1

## RULES

Fed. R. App. P. 4(a)(1)(A) ...................................................................1

## OTHER AUTHORITIES

Restatement (Second) of Torts § 46 (1965)................................40, 42, 43

Restatement (Third) of Torts § 46 ........................................................50

*Authorities upon which we chiefly rely are marked with asterisks.

**Glossary of Abbreviations**

M.P.        Initials used throughout litigation to refer to male perpetrator

MPD         District of Columbia Metropolitan Police Department

DCPS        District of Columbia Public Schools

PTSD        Post-Traumatic Stress Disorder

## Statement of Jurisdiction

Appellant, Jane Doe by and through her next friend Julie Doe, the plaintiff below, brought this action in the United States District Court for the District of Columbia on September 21, 2018, asserting claims under federal law (Count I, II, III) against Appellee, District of Columbia ("the District"), and under the common law of the District of Columbia (Counts IV, V, VI, and VII) against the Appellees the District and the Aqueelha James. (A. 17-41.) Jane Doe alleged that the District Court had subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3) & (4), and 28 U.S.C. § 1367. (A. 19)

On September 14, 2023, the district court granted Defendants' motions for summary judgment. (A. 1193) On October 13, 2023, Jane filed her notice of appeal. (A. 1166.) The appeal was timely filed within thirty days of the entry of the order granting summary judgment, in accordance with Rule 4(a)(1)(A) of the Federal Rules of Appellate Procedure. This Court has jurisdiction of the appeal under 28 U.S.C. § 1291 because the appeal is from a final decision of the district court that disposes of all parties' claims.

**Statement of the Issues**

1. In order to prove a private cause of action under 20 U.S.C. § 1681(a).
   (Title IX) involving student-on-student sexual harassment, a plaintiff
   must demonstrate the school acted with deliberate indifference to the
   alleged harassment and that this deliberate indifference must cause
   students to undergo harassment or make them liable or vulnerable to
   it.  This a factual inquiry, which requires weighing the evidence.  Did
   the district court ignore material facts that demonstrate that the
   District acted with deliberate indifference to Jane's report of sexual
   assault in granting the District's motion for summary judgment on this
   claim?

2. In order to prove retaliation under 20 U.S.C. § 1681(a). (Title IX), a
   plaintiff must establish that she made a charge made unlawful by Title
   IX, and that the school took materially adverse action because of her
   protected conduct.  This is also a factual inquiry, which requires
   weighing the evidence.  Did the district court ignore material facts that
   demonstrate that the District took adverse action against Jane in
   granting the District's motion for summary judgment on this claim?

3. In order prove a claim of intentional infliction of emotional distress, a
   plaintiff must prove extreme and outrageous conduct on the part of the

defendant, which intentionally or recklessly causes the plaintiff severe emotional distress. Under D.C. law, intent can be inferred from the outrageousness of the conduct. Did the district court commit legal error in failing to analyze the outrageousness of James's conduct prior to examining her intent, thereby depriving Jane of the benefit of that inference and failing to take into account all of the relevant circumstances surrounding the conduct, when it found that she could not prove James intentionally or recklessly caused her severe emotional distress?

4. In order to plead a claim of negligent infliction of emotional distress, a plaintiff must plead that the defendant has a relationship with the plaintiff, has undertaken an obligation to the plaintiff of a nature that necessarily implicates the plaintiff's emotional well-being, that there is an especially likely risk that the defendant's negligence would cause serious emotional distress to the plaintiff, and that negligent actions or omissions of the defendant in breach of that obligation have caused serious emotional distress to the plaintiff. Here, Jane pled both a special relationship and an undertaking on the part of the Appellees to investigate her report of sexual assault. Did the district court err in

granting Appellee's motion to dismiss when it found that Jane did not plead such a relationship?

## Statutes and Regulations

Pertinent statutory authority is reproduced *infra* in the Statutory Addendum.

## Statement of the Case

Jane Doe, through her next friend, Julie Doe, commenced this action on September 19, 2018. (A. 17-41). Following service of process, the Appellees filed motions to dismiss the complaint as to all counts. Appellant filed her opposition to the motions. The district court ruled that Counts I (Title IX) and II (retaliation) of the complaint would proceed against the District, and that Count IV (intentional infliction of emotional distress) would proceed against James and the District. (A. 867-914). All discovery closed on December 6, 2021.

Following closure of discovery, Appellees moved for summary judgment and Jane moved for summary judgment on one element of her Title IX count (notice). The district court granted Appellees' motions for summary judgment, as well as Jane's motion for summary judgment on September 14, 2023. The grant of Appellees' motions resulted in the dismissal of Jane's remaining claims of Title IX, retaliation and intentional infliction of emotional distress.

**Statement of the Facts**

I.    <u>**Jane Doe Was Sexually Assaulted at RHS on June 13, 2017**</u>

       Roosevelt High School ("RHS") is a public school in the District. (A. 386). On June 13, 2017, Jane was a freshman student at RHS. Id. That day, she was in a classroom with approximately 10 other students, including MP.[1]  (A. 389). While waiting for their teacher, M.P. took Jane's phone charger and would not give it back. (A. 389).  M.P. left the classroom with the charger, and Jane followed, asking that he return the charger to her.  (A. 389). As shown on RHS video (A.634), as the two neared a bathroom, M.P. tried to pull Jane into the bathroom with him.  When she resisted, he forcefully dragged her into the restroom against her will.  (A. 390, 634).  M.P. pushed Jane into a bathroom stall, groped her breasts and buttocks, tried to lift up her dress, and kissed her neck so forcefully that he left a mark, while Jane cried and yelled at him to stop. (A. 390). When M.P. finally stopped the assault, he left the bathroom. Id. School video captures Jane subsequently exiting the bathroom, visibly upset, separately from M.P. (A. 390, 634).  Jane then called her mother, Julie Doe, begging to go home.  (A. 386, 390). Jane left school, went home, and provided her mother with details about the sexual assault. (A. 390).

---

[1] "M.P." are the initials used in this litigation to refer to the male perpetrator.

That same day, Julie verbally reported the sexual assault to law enforcement, who told her to file a report through a school administrator. (A. 391). Julie contacted Instructional Superintendent David Pinder and informed him that her daughter had been sexually assaulted. (A. 387, 391). Pinder told Julie that as a District employee he could not take her complaint, as his role was to protect the school and District. (A. 391). Julie also contacted RHS and set up an appointment to meet at school the day after the assaulted.  (A. 391).

## II. The District Failed to Provide Title IX Training to RHS Administrators, Personnel, and Students

At this point in time, the District had just one Title IX Coordinator, Lynice Hannah, who was part of the District's Civil Rights Team (later re-branded and renamed "CARE"), and the majority of her duties pertained to athletics.  (A. 388, 397). Ms. Hannah was the sole person responsible for conducting Title IX sexual harassment investigations in the District, which served approximately 50,000 students at 118 schools. (A. 386, 388).

At the end of 2016-2017 school year, when Jane Doe was sexually assaulted at RHS, the District had not provided RHS administrators or personnel any training regarding Title IX, student-on-student sexual assault and harassment, how to interview students reporting sexual assault, not responding with bias to such reports, or not retaliating against students who report sexual assault. (A. 391-92).

Nor had the District provided any Title IX or sexual harassment training for students. (A. 393).

### III.  **James' Response to Jane Doe's Report of Sexual Assault**

On June 14, 2017, Julie Doe emailed James and Pinder that "[a] young man, with the name [M.P.] pulled my daughter into a male restroom yesterday and sexually assaulted her." (A. 393; 641).

Later that day, Jane and Julie went to RHS and met with James, Assistant Principal Michael Moss, and Instructional Coach Maurice Butler. (A. 387-88; 393). The meeting took place in a conference room on the main floor of RHS, across from the school's main office. (A. 394). Reginald Stevens, the lead Dean of Students for RHS, participated in the meeting by phone. (A. 387, 394). Julie Doe placed her cell phone on the table in the conference room and audio recorded the meeting because of Pinder's response to being notified that Jane had been sexually assaulted, and to ensure that her daughter would obtain justice. (A. 394). Upon request, Jane was interviewed and disclosed details of the sexual assault to the school officials, including the perpetrator's identity. Id.

James – despite knowing that Jane was "very upset" – was disrespectful, insensitive, and treated Jane like she was "crying rape" and that the assault was her fault. (A. 394-95). Jane left the conference room because she was upset by James, and Julie followed so she could comfort her daughter. Id. Julie Doe did not intend to leave her phone in the room; she was not even thinking about her phone and instead was focused on Jane, who was hysterical. (A. 395). Julie told Jane that she did not have to sit through the rest of the meeting. (A. 395).

While the Does stood in the hallway, just a step or two outside of the open door to the RHS conference room where the meeting was still taking place[2], James stated:

> **[S]ince I walked into this building, I immediately responded to what I knew was bullshit . . . this whole thing is going to blow up in her face, that is why I am going to go the extra mile and call MPD because I am sick of her, sick and tired of her and her mom. So I am going to call MPD and have a long and drawn out email just so I can embarrass her ass.**

(A. 395-96). James also stated to Stevens, "**you should see the dress that she has got on**," and laughed and otherwise ridiculed Jane. (A. 396). Julie then returned to the conference room, and the meeting finished (A. 396). Jane was interviewed by Butler. (A. 394).

## IV.    The District Ignored Jane's Title IX Civil Rights

Although the District admits they should have done so, not a single school administrator or employee informed the Does of Jane's civil rights under Title IX. (A. 397).

Nor did the administrators comply with the District's "Grievance Policy and Procedure." (A. 397-99). This Policy identified steps that District officials – and a school's "Grievance Point of Contact" in particular – were supposed to take to ensure that the District investigated a student's report of sexual harassment and

---

[2] If Julie Doe had stepped back one or two inches, she would have been able to see directly into the conference room. (A. 395).

connected the student with the District's Title IX Coordinator. (A. 397-98).

Pursuant to the Policy, filing a "grievance" initiated an investigation by the

District, to be completed in ten days, followed by the issuance of a "Letter of

Resolution," in which the District memorialized the allegations, steps it had taken

to review the allegations, findings of fact, and whether or not the allegations were

substantiated. Id.

However, James was unaware that the District even had a Grievance Policy

and Procedure. (A. 392). She also did not know the District had a Title IX

Coordinator, that she was supposed to report sex crimes or sexual harassment to

the Title IX Coordinator. Id. The District permitted James, with no vetting or

approval from the District's Central Office, to appoint the "Grievance Point of

Contact" for RHS. 85-86. James appointed Intervention Coach Maurice Butler to

the position. (A. 397-98).

The District did not provide Butler with training on the Grievance Policy

and Procedure, Title IX, or sexual harassment, which would have included an

overview of the grievance process and how to address allegations that implicated

Title IX. (A. 398). In fact, the District knew that, of its 110 Grievance Points of

Contact during the 2016-2017 academic year, less than 25 had received this Title

IX training. Id. Butler himself was unaware that he served as point of contact for

Title IX matters at RHS, and he did not file a grievance for Jane Doe, which he should have done. Id.

Nor did any school administrator inform the District's Civil Right Office of Jane Doe's complaint of sexual assault. Id. The Does did not receive a "Letter of Resolution" or other documentation concerning the outcome of any investigation performed by the District with respect to Jane's report of sexual assault, although one was ostensibly created. (A. 341-42; 399).

## V. The District Denied Jane a "Victim Transfer" to Another School

After the sexual assault, Jane understandably did not feel safe at RHS and did not feel she would be able to finish high school there. (A. 399, 404-05). The District has admitted that the sexual harassment perpetrated against Jane Doe would have been sufficient to constitute a hostile environment for Jane at RHS. (A. 400).

Milo Howard was a Specialist within the District's Office of Student Supports, and he was responsible for the (a) "immediate and voluntary," (b) "involuntary," (c) "victim," and (d) "discretionary "student transfer processes. Id. The "victim transfer" process typically was initiated by a school administrator, who would inform Howard's office that a student had been the victim of a criminal offense and needed to transfer to another school for his or her safety or well-being. Id. ¶ The victim transfer process could also be initiated by a parent, the Office of

11

Attorney General, or the FBI. Id. For a "victim transfer," Howard expected a school to provide him with substantiating documentation, like a police report or an investigation completed by CARE / the Civil Rights Office. Id. Once that documentation was received, Howard would review it and make a transfer recommendation to the Instructional Superintendent, who would make the ultimate decision regarding a transfer. Id.

No administrators submitted a transfer request for Jane. Id. Instead, Julie requested a transfer for Jane. Id. The Does hoped that the District would permit Jane Doe to transfer to Wilson High School or School Without Walls, schools much safer and more academically-oriented than RHS. (A. 401; 404-05). This was the first time the Does had requested a transfer for Jane. (A. 401).

With respect to Jane's transfer request, Howard asked Pinder, "[w]as this a **valid sexual assault** or was this considered to be 'unfounded'?" (A. 401) (emphasis added). Pinder responded, "I am unaware of the conclusion of the investigation. Copying Principal James for information on this. As I've explained to mom before we don't negotiate with parents on placement." Id. Howard responded:

> Exactly. The parent cannot be allowed to broker a school based upon the student's incident. If the student was truly a victim of a criminal offence then [the District] can provide a school assignment and stand firm with it. . . . If she was not a victim then she stays at [RHS].

Id. On July 18, 2017, RHS Dean of Students James Taylor informed Howard that the Office of Attorney General had declined prosecution. (A. 401-02). At no point

did any administrators send Howard a Letter of Resolution, or indicate to Howard what the video of the assault showed.  (A. 401).

Because he did not receive the Letter of Resolution or any other corroborating evidence of the assault, Howard initially did not permit Jane to transfer schools. Id. Had Howard received a Letter of Resolution that stated Jane Doe's report of sexual assault was substantiated, he would have granted Jane's victim transfer request. Id.

## VI.  **James Misrepresented the Sexual Assault to the District**

On the evening of June 14, 2017, after the Does returned from their meeting with school administrators at RHS, Jane and Julie Doe, together, listened to the recording of that meeting.  (A. 402). Julie Doe then emailed the recording to Dr. Pinder and Mayor Muriel Bowser. Id.

On approximately June 22, 2017, Principal James watched video capturing part of the assault that Jane Doe described. when she returned from vacation. Id. ¶¶ Despite the fact the video plainly shows M.P. dragging Jane into the bathroom against her will, James informed her supervisor, Pinder, that she did not believe Jane's accusation of sexual assault. Id. James also told Pinder that M.P. and Jane were "hand-and-hand" and "entered the bathroom mutually." Id.  She similarly mischaracterized the assault in a June 26, 2017 email to Dr. Spence (Pinder's supervisor), in which James described the assault solely as "the boy kept trying to hold [Jane Doe] down and kiss her." (A. 402-03).

On August 16, 2017, Pinder finally viewed the video personally, and he determined that it clearly showed that M.P. pulled Jane into a school bathroom against her will.  (A. 403). What Pinder saw in the video did not align with James's characterization of the events, and it changed his perspective regarding the incident. *Id.* (A. 402-03). Pinder submitted an Incident Report to the District's Labor Management Employee Relations, requesting a formal investigation of James. (A. 403). Pinder reported that he had listened to the audio recording of the June 14, 2017, meeting between Principal James, RHS administrators, and the Does, and stated:

> The conversation between Ms. James and Mr. Moss was quite concerning after [Julie Doe] left. During this discussion Ms. James indicated that she was going to call "MPD to embarrass" [Jane and Julie Doe].  She also indicated that she believed [Julie Doe] or [Jane Doe] was "full of shit."
>
> This is concerning for several reasons. First, it is the responsibility of the principal to take all allegations of misconduct very seriously and to ensure that these investigations are conducted professionally and without malice towards any student. **Additionally, MPD or other legal divisions should never be used to embarrass or humiliate a student,** but rather to conducts a fair and impartial investigation of the facts. Further, in my conversations with Ms. James about the incident she indicted to me that there was no evidence on the video of an assault. In fact, she indicated that it appeared that the young man and [Jane Doe] were hand-in-hand and enterer the bathroom mutually. Today, August 16, I was able to view the video of the incident. Clearly, the young man pulled [Jane Doe] in the bathroom against her will. And it was clear that when she exited the bathroom that she was upset/visibly anxious. This incident should have been handled very differently by Principal James. **Her clear distrust of [Jane Doe or Julie Doe] in the audio tape clouded her judgment and**

**endangered student safety. Additionally, her reckless and unprofessional conversation with Mr. Moss was a breach of the trust expected of our school leaders when handling such a sensitive matter**. Finally, Ms. James was not transparent with me about the nature of this incident or her response to it.

(A. 403-04). Pinder considered James's statement – that she would make a report to MPD for the purpose of embarrassing a student – as potentially biasing any investigation. *Id.* (A. 404). The District formally reprimanded James for her misconduct. Id.

After Pinder reviewed the video footage of the sexual assault, he requested that Jane Doe be permitted to transfer to Wilson High School ("Wilson"). Id. ¶ This transfer to Wilson occurred just a week before school started. Id.

Over the course of that summer, Jane Doe suffered anxiety and stress due to James and the District's response to her report that MP sexually assaulted her. (A. 387). She explained:

> Having been the victim of sexual assault, being humiliated and degraded by Principal James who treated me like a liar and blamed me for being assaulted, and facing the prospect of having to transfer to another school like [RHS] – it all caused me [to] distrust people in general, and especially people in authority like school officials.
>
> All during the Summer of 2017 I had to wait and hope that the District would let me transfer to either Wilson or School Without Walls, a much safer school than the three offered to me,[3] and this caused me

---

[3] While the District denied Jane Doe a "victim transfer," it offered her the option of transferring to three schools in the District – Phelps, Eastern, or Cardozo – which were just as unsafe as RHS, if not even more unsafe, and were less academically oriented than RHS. *Id.* ¶ 216.

anxiety and stress. I could not understand why the District would disregard my safety and education, knowing that I was dragged into a boys' bathroom and sexually assaulted at school, during the school day … I felt that no adult at school would keep me safe. (A. 404-05; 663-72).

Julie testified to the changes she observed in Jane Doe during the Summer of 2017:

My baby began shrinking. She felt extremely betrayed by people in positions of authority. So of course, you know, she became really, really distrusting …She could not believe that people she trusted treated her this way … And they not only failed her but they blamed her for being sexually assaulted. (A. 405).

## VII. The District Did Not Discipline M.P.

The next academic year (2017-2018), M.P. transferred to his "neighborhood" school, another public school within the District.(A. 399). Pinder was the Instructional Superintendent for that school, and he informed the school of the incident. Id. However, the District did not discipline or suspend MP for his sexual assault of Jane Doe, and there is no documentation concerning the assault in any of his educational records. Id.

## VIII. The District Took Punitive Actions against Jane

### A. Sophomore Year, 2017-2018

Jane Doe transferred to Wilson for her sophomore year, the 2017-2018 academic year. (A. 406). By this point in time, the District had purportedly concluded that Jane's report of sexual assault was substantiated, but it did not provide this determination, through a Letter of Resolution or otherwise, to the Does or Principal

16

Martin. Id. The District did not provide Wilson with transfer paperwork for Jane, and neither James nor any other administrator informed Martin about Jane's report of sexual assault or an investigation of that report. Id.

At Wilson, Jane struggled in different ways, explaining, "I did not trust most of my teachers or school administrators. I had a hard time focusing on schoolwork because [I] felt sad and depressed a lot of the time, especially in my first year there." (A. 406-07). From the very beginning of Jane's sophomore year at Wilson, the District began penalizing her for unexcused absences that should have been excused, or when she was not even absent. *Id.* (A. 407). This included marking her pre-approved therapy appointments as unexcused. Id. This caused Jane to suffer stress, anxiety, and depression, which in turn caused her to miss more school, and made it more difficult to finish her assignments. Id.

During Jane's sophomore year at Wilson, the District marked her absent for **74 days**, with **48** of them "unexcused." Id. All but seven of the unexcused absences were incorrect. Id. Because the District incorrectly marked Jane as unexcused for these absences, a "PINS[4]" truancy case was opened against the Does. Id.

---

[4] This was a "Person In Need of Supervision" proceeding, conducted pursuant to Washington D.C. truancy laws.

## B. **Junior Year, 2018-2019**

At the beginning of Jane's junior year, Julie provided the District with medical documentation from Georgetown University Hospital Department of Psychiatry to excuse Jane from school on Mondays so that she could attend therapy appointments. (A. 408-09). At that point in time, Jane's class rank was 304 out of 409. (A. 408).

On approximately September 27, 2018 – just after Jane had filed her federal lawsuit against the District and the Washington Post published an article regarding the lawsuit –Principal Martin and other Wilson administrators "gleaned" that Jane had reported being sexually assaulted at RHS. Id. Principal Martin also knew that, as of October 17, 2018, the District had marked Jane Doe with 13 unexcused absences, and that Jane was attending therapy appointments associated with the sexual assault. (A. 409). However, Martin did not reach out to CARE or any other person in the District who had Title IX responsibilities to discuss the situation, nor did she instruct teachers that they should excuse Jane's absences for therapy. Id.

In September 2018, the District removed Jane from the cheerleading team because of her absences.  (A. 409-10). Jane was not permitted to attend cheerleading on days that she missed school, and this included days when she was absent for therapy appointments and due to her anxiety and depression about the incidents that had occurred. (A. 410).

Around this same time, a DCPS security guard said to Jane Doe, "oh, you're the girl from Roosevelt that was sexually assaulted."[5] (A. 409). And Ms. Ward, a teacher, approached Jane, said she knew what happened to Jane at her previous school, and told her she should stop using the sexual assault as an "excuse." Id. ¶

The Does filed a grievance with the District in October 2018, reporting that Jane had been marked absent and unexcused when she should have been excused for medical appointments, Jane had been removed from cheerleading because of absences, and Wilson had required her to complete 50 assignments in two days. (A. 410). The District, in letters dated November 27, 2018 and January 18, 2019, defended these actions, with no mention whatsoever of Jane Doe's report of sexual assault or the findings of the Title IX investigation. Id.

In December 2018, Jane was diagnosed with post-traumatic stress disorder ("PTSD"). Id. At this point in time, Jane was ranked 393 out of 414 students in her class. Id.

In March 2019, Jane stopped attending therapy sessions because the District continued marking her absent and would not allow her to make up work, which caused her grades to drop further. (A. 411). Jane had to pick and choose whether she wanted to attend therapy or run the risk of facing continuing truancy issues with the District. (A. 411).

---

[5] The District acknowledged that this occurred and the security guard's conduct constituted "harassment." *Id.* ¶ 161.

On May 10, 2019, the Does, through their attorney, sent correspondence to Principal Martin, reminding her that Jane was diagnosed with PTSD as a result of the violent sexual assault that led to her transfer to Wilson, and requesting that Jane's absences for standing therapy appointments be excused. (A. 411-12). The Does requested a multi-disciplinary team meeting to confirm that Jane's grades accurately reflected the worked she had completed. (A. 412).

On June 6, 2019, the Does met with school officials and stressed the importance of correcting Jane's inaccurate attendance records, particularly because the failure to do so was impacting her grades and causing her undue stress and anxiety, compounded by her existing PTSD. Id.

On June 18, 2019, the District informed Jane that she had failed U.S. History due to having more than 30 unexcused absences from class, and she should attend summer school. (A. 413). The Does responded and reiterated the request that the District correct Jane's attendance records, including for U.S. History. Id. Principal Martin responded by instructing the attendance counselor for Wilson to "feel free **not** to reply to" the Does' "accusations." Id. (emphasis in original).

On June 22, 2019, the Does escalated their concerns to Scott Barash (General Counsel for the District) and Drewana Bay (Instructional Superintendent). Id. The Does reminded them that Jane had been diagnosed with PTSD, was seeking disability accommodations, and had inaccurate academic and attendance records.

Id. The Does informed the District that it was ignoring its responsibilities under its Title IX investigation. Id.

On July 8, 2019, the Does provided the District a detailed analysis demonstrating that the District had incorrectly marked Jane Doe as "unexcused" <u>47 times</u> for which she should have been excused. Id. ¶

On July 30, 2019, the Does – left with no other choice given the District's refusals to act – filed another grievance, complaining that the District, yet again, had improperly marked Jane as absent and unexcused when she was in pre-approved counseling sessions. Id.

At the end of Jane's junior year, the District had marked her absent **for <u>106</u> total days, <u>56</u> of them "unexcused."** (A. 411). Jane's final grades for her junior year were one A, 2 Bs, 2 Cs, 3 Ds, and 2 Fs. Id.

### C. <u>Senior Year, 2019-2020</u>

In a letter dated September 13, 2019, the District admitted it had incorrectly marked 10 of Jane Doe's absences as "unexcused." (A. 414). However, those mistakes were not rectified immediately. Id.

In the fall of 2019, Mr. Harberger, a teacher, said that Jane should stop using being sexually assaulted as an excuse to get out of class. Id.

Jane ranked 351 out of 407 students. Id. As of January 28, 2020, her grades included one A, one C, and an F. Id.

**IX. Defendants Caused Jane to Suffer Emotional and Psychological Injuries**

Jane began attending therapy during her sophomore year in the District, and she was diagnosed with PTSD in December 2018. (A. 407, 410). Jane has experienced suicidal thoughts and behavior, insomnia, recurrent and involuntary distressing memories, including with respect to being blamed for sexual assault because of how she was dressed, and of not being believed. (A. 417). Dr. Eileen Ryan, Jane's expert in this case, has opined that the sexual assault Jane suffered at RHS and James's negative response to the report of that sexual assault has caused Jane to suffer from chronic PTSD and major depressive disorder, severe. (A. 416-17). Principal James's suspicion towards Jane's report of sexual assault exacerbated Jane's PTSD symptomatology and is also a factor in her depression. (A. 417-18).

**Standards of Review**

"[T]his Court reviews de novo the district court's grant of [a] motion to dismiss [a] complaint." *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 685 (D.C. Cir. 2023) (citing *King v. Jackson*, 487 F.3d 970, 972 (D.C. Cir. 2007)).

This Court "review[s] the district court's grant of summary judgment *de novo*" and "can affirm only if the district court committed no material error of law and

there are no genuinely disputed issues of material fact." *Crawford v. Duke*, 867

F.3d 103, 107 (D.C. Cir. 2017) (citation omitted).

## Summary of Argument

1. The district court erred in granting the District's motion for summary judgment

on Count I (Title IX) of Jane's complaint. The district court held that Jane did not

present evidence that the District acted with deliberate indifference in response to

her report of sexual assault. This ruling is erroneous because it is based on a

truncated view of the facts in the record as well as misapprehensions of certain

material facts. In reaching its conclusion, the district court specifically failed to

consider: (1) James's statements after the June 14, 2017 meeting to David Pinder

indicating that she did not believe Jane's assault claim and mischaracterizing the

video showing the assault as depicting Jane and the assailant walking "hand-in-

hand" and "mutually" entering the bathroom, as well as her email to Dr. Spence

mischaracterizing the assault itself; (2) James and the other RHS administrator's

failure to convey the results of the investigation of the assault to Milo Howard, the

individual in charge of victim and safety transfers for the District; (3) the delay

these failures and mischaracterizations caused in securing a transfer for Jane and

the impact it had on her mental health; (4) that despite making a Title IX finding

which substantiated Jane's report, the District failed to disseminate this finding to

any administrator that could have implemented it for Jane, thereby causing her to

be marked unexcused when she was absent for therapy, and a three-year long battle with the District to ensue up until her graduation in order to correct her academic and attendance records; and, (5) the fact that the assailant student, M.P. did not transfer out of the District's school system, and even still the District did not discipline him.

In reaching its conclusion, the district court effectively held that a plaintiff must demonstrate that a school district did *nothing* in response to a report of sexual assault. This is not the standard espoused by *Davis*, the seminal case on the issue, which indicates that while the standard does not require a Title IX defendant to purge its school of actionable peer harassment, *nor does it require courts to conclude that "minimal, ineffective, or belated efforts to respond to sexual harassment are not clearly unreasonable as a matter of law*." Here, the District's response was all three – minimal, ineffective, and belated.

Nor is the district court's conclusion consistent with *Gebser*, which states that a Title IX plaintiff can [also] establish school district liability by showing that a single school administrator with authority to take corrective action responded to harassment with deliberate indifference. The district court failed to consider this authority when reaching its determination that the District did not act with deliberate indifference to Jane's report of sexual assault, in particular in so far as

the District's conduct related to James's conduct toward Jane. Accordingly, the district court's dismissal of Count I of the complaint should be reversed.

2. The district court likewise erred in granting the District's motion to dismiss Count II of the complaint (retaliation). This ruling is erroneous because, like the court's ruling dismissing Count I, it is also based on a truncated view of the facts in the record as well as misapprehensions of certain material facts. In reaching its conclusion, the district court specifically failed to consider: (1) James's statements after the June 14, 2017 meeting to David Pinder indicating that she did not believe Jane's assault claim and mischaracterizing the video showing the assault as a depicting Jane and the assailant walking "hand-in-hand" and "mutually" entering the bathroom, as well as her email to Dr. Spence mischaracterizing the assault itself; (2) James and the other RHS administrator's failure to convey the results of the investigation of the assault to Milo Howard, the individual in charge of victim and safety transfers for the District; (3) the delay these failures and mischaracterizations caused in securing a transfer for Jane and the impact it had on her mental health; (4) Wilson's failure to take any steps to protect Jane after learning in about September 2018 that she had been sexually assaulted and had taken the protective action of filing a lawsuit; (5) Wilson's continuous marking of unexcused absences after learning about the sexual assault claim; and, (6) the prolonged failure to correct Jane's academic and attendance record *after* learning

of the sexual assault claim and after repeated requests to do so by the Does.  Each of these action constitute adverse action in response to a report of a sexual assault, because they are exactly the kind of behavior that a retaliation claim is supposed to prevent.  Accordingly, the district court's dismissal of Jane's retaliation claim should be reversed.

3. The district court committed legal error in dismissing Jane's claim of intentional infliction of emotional distress against James and the District. To prove intentional infliction of emotional distress, Jane must have demonstrated that James's conduct was so extreme and outrageous, and that it intentionally or recklessly caused her severe emotional distress.  Under D.C. law, intent can be inferred from the outrageousness of the conduct.  But the district court did not examine the outrageousness of James's conduct, and thereby deprived Jane of the benefit of that inference.  Additionally, as in the two preceding sections, the district court failed to consider James's post-June 14, 2017 meeting conduct, and its impact on Jane's emotional distress.  Accordingly, the district court's dismissal of Jane's intentional infliction of emotional distress count should be reversed.

4. The district court committed legal error when it dismissed Count V (negligent infliction of emotional distress) of Jane's complaint at the motion to dismiss stage. The court found that Jane was required plead both a special relationship between Jane and the Appellees *as well as* an undertaking on the part of the Appellees,

which would necessarily implicate her emotional well-being, and did not. But Jane did plead facts that demonstrated both a special relationship (student-school), and that the school did undertake an investigation following her sexual assault report. Moreover, Jane included ample allegations in her complaint that the Appellees knew or should have known that she was emotionally vulnerable, and that it was foreseeable that their negligence in carrying out its investigation or the implementation of its recommendations would cause Jane significant emotional distress.

In reaching this conclusion, the court relied on *Sibley v. St. Alban's*, which is not only distinguishable as a matter of pleading, but also on the grounds that the case was decided based upon a contract that defined the duty owed to the plaintiff in that case, and which is notably absent here.

Accordingly, the district court's reliance on *Sibley* was misplaced. This court should find that Jane has adequately pled her claim of negligent infliction of emotional distress and reverse the district court's holding reflecting the same.

## Argument

1. **The district court's dismissal of Jane's Title IX claim because she did not adduce evidence sufficient to show that the District acted with deliberate indifference in response to her report of sexual assault was based on a truncated weighing of the factual record in a light that was favorable to the District. This was in contravention of the standard of**

**review at summary judgment and not in accordance with *Davis* and its progeny.**

Title IX of the Education Amendments of 1972 provides, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Individual plaintiffs may seek damages under Title IX when a recipient of federal funding, like the District, fails to comply with Title IX's requirements. *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998). Title IX liability arises "from 'an official decision by the recipient not to remedy the violation.'" *Davis*, 526 U.S. at 642 (quoting *Gebser*, 524 U.S. at 290).

To establish a Title IX claim based on student-on-student sexual harassment, the plaintiff must establish:

(1) She was a student at an educational institution that received federal funds;

(2) She suffered sexual harassment that was so severe, pervasive, and objectively offensive that it deprived her of equal access to the educational opportunities or benefits provided by her school;

(3) The school, through an official possessing the authority to address the alleged harassment and institute corrective measures, had actual notice or knowledge of the alleged harassment;

(4) The school acted with deliberate indifference to the alleged harassment and that this deliberate indifference must "cause[ ]

students to undergo harassment or make[ ] them liable or
vulnerable to it."

*Id.* at 645-52; *Gebser*, 524 U.S. at 290-92; *Doe v. Fairfax Cty. Sch. Bd.*, 1

F.4th 257, 263-64 (4th Cir. 2021).

The fourth element – deliberate indifference – is at issue in this case.

With respect to this element, the Supreme Court has indicated that the "deliberate

indifference" standard is a "high" one. *Davis*, 526 U.S. at 643, 648. "Deliberate

indifference" can be found "only where the recipient's response to the harassment

or lack thereof is clearly unreasonable in light of the known circumstances." *Id*.

This standard considers "the level of disciplinary authority available to the school

and ... the potential liability arising from certain forms of disciplinary action." *Id.*

at 649. The standard neither requires that the school purge its school of actionable

peer harassment, *nor does it require courts to conclude that "minimal, ineffective,*

*or belated efforts to respond to sexual harassment are not clearly unreasonable as*

*a matter of law*." *Id.* at 647 (emphasis added).

Deliberate indifference is also described as "an official decision by the [funding]

recipient not to remedy the [Title IX] violation." *Gebser*, 524 U.S. at 290. A

school may be held liable where the combined systemic effect of the sexual

harassment and the school's response effectively denies the victim access to a

scholastic program or activity. *Fairfax Cty.*, 1 F.4th at 273-74; *Fitzgerald v.*

*Barnstable Sch. Comm.*, 504 F.3d 165, 172-73 (1st Cir. 2007), *rev'd and remanded*

*on other grounds*, 555 U.S. 246 (2009); *Williams v. Bd. of Regents of Univ. Sys. of Georgia*, 477 F.3d at 1282, 1295-97 (11th Cir. 2007); *see also Doe v. Bibb Cty. Sch. Dist.*, 126 F. Supp. 3d 1366, 1380 (M.D. Ga. 2015), *aff'd* 688 F. App'x 791 (11th Cir. 2017) ("while the further discrimination may be sexual harassment the plaintiff experienced, this need not be the case," and "further discrimination" occurs when a school's deliberate indifference prevents the plaintiff from attending school). A Title IX plaintiff can [also] establish school district liability by showing that a single school administrator with authority to take corrective action responded to harassment with deliberate indifference. *See Gebser*, 524 U.S. at 290.

Determining whether "a plaintiff alleging student-on-student harassment has met these requirements is 'a fact[–]intensive inquiry that often must be resolved by the trier of fact.' " *Cavalier v. Catholic Univ. of Am.*, 306 F. Supp. 3d 9, 26 (D.D.C. 2018) (quoting *Karasek v. Regents of the Univ. of Cal.*, 2016 WL 4036104, at *11 (N.D. Cal. July 28, 2016)). Nevertheless, *Davis* does permit courts to decide at the motion for summary judgment stage whether a school's response was not clearly unreasonable as a matter of law. *Davis,* 526 U.S. at 649.

In determining that Jane failed to produce evidence sufficient for a jury to find that the District's response to her claim of sexual assault was deliberately indifferent, the district court both failed to consider several relevant facts, and

therefore, failed to draw inferences from these facts in a light most favorable to Jane as the nonmovant (A. 1140-1147):

- The district court did not consider the impact that James's conduct had on the District 's investigation of Jane's sexual assault claim. Id. Although it is true that James directed Butler to take a statement from Jane, and Moss to contact and work with MPD, she also deliberately misconstrued the facts of the assault, and what the video leading up to the assault showed, to Pinder and Spence, her supervisors. (A. 403-04). Pinder testified that because of these misrepresentations by James of the facts of the assault, which he believed was due to her personal animus or suspicions towards the Does, he did not initiate or approve any kind of transfer for Jane until he viewed the video himself and listened to James's recorded statements from the June 14, 2017 meeting – two months after the assault occurred. (A. 530-36; 636-40). This caused a delay in the approval of Jane's transfer request, and also caused her additional stress, anxiety, and depression. (A. 536, 663-671). Because James was an administrator with authority to take corrective action (A. 528-29), and because she *deliberately* did not take corrective action vis-à-vis Jane's report, but instead took steps to undermine her corroborated report of sexual assault and her transfer request (A. 530-36; 636-641), these facts

alone are enough for a reasonable jury to find that the District, through

James, acted with deliberate indifference towards Jane.  *See Gebser*, 524

U.S. at 290.

- During Howard's consideration of the Does' transfer request for Jane,

  Howard reached out to RHS to determine if this was a "valid" sexual

  assault or not.  (A. 401). Despite this request, the Roosevelt administrators

  only indicated the conclusion of the MPD investigation – i.e. that the

  District attorney had declined to prosecute M.P.. (A. 401-02). The RHS

  administrators involved in the investigation, including James, never

  indicated to Howard their findings concerning the assault. (A. 401). This

  includes the review of the video footage and the July 17, 2017 Letter of

  Resolution. (A. 401). This caused Howard to deny the Does transfer

  request initially, thereby contributing to the delay in determining Jane's

  fate for the following school year.  (A. 401).

- At no point does the record reflect that the July 17, 2017 Letter of

  Resolution (A. 341-42), was ever transmitted to anyone at RHS, Wilson,

  or to Pinder, Howard, or anyone else in the District administration. (A.

  341-42; 401;406).  This "finding" by the District occurred in a vacuum.

  In fact, Principal Martin testified that she was unaware of the sexual

  assault perpetrated against Jane until sometime after the complaint in this

action was initiated in September 2018.  (A. 408). The impact of the failure of the District to transmit this letter to Wilson in particular was significant.  Because Wilson did not have the letter, the administrators there began marking Jane absent immediately starting her sophomore year.  (A. 407). As described *supra* at 16-22, this snowballed and was only partially corrected on September 18, 2019, during Jane's senior year, and only after the Does had initiated not one but two, grievance procedures to have this corrected. (A. 407-414). But by then, the damage had been done – Jane had dropped in the class ranking during the previous two school years, stopped her therapy because of her inability to attend, been placed in a truancy program, and had been expelled from cheerleading.  Id.

- Contrary to the district's court assertion otherwise, M.P. was not out of the District's control when he transferred from RHS at the beginning of the 2017-2018 school year.  (A. 399). He transferred to another public school in the District.  Id. Pinder testified that he made a report to that school about the assault.  Id. However, inexplicably, M.P. was never disciplined in any fashion.  Id. There is not even a record that the District ever discussed the assault with him.  Id. And no one ever informed the Does that he was still within the District's school system.  Id.

Each of these actions by the District negatively affected Jane and caused her distress. (A. 663-671). By failing to consider these salient facts and draw the inferences therefrom in the light most favorable to Jane, the non-movant in this matter, the district court erred in finding that Jane did not produce evidence sufficient to show deliberate indifference.

In effect, the district court held that in order for a plaintiff to prove a claim of deliberate indifference against a recipient school district under Title IX, a plaintiff needs to show that the recipient took *no action* in response to the plaintiff's report of sexual assault. (A. 1144). However, this ruling is not what the *Davis* court intended when it permitted courts to act as the evidentiary gatekeepers for this prong of Title IX claims. *See Davis*, 526 U.S. at 647 (stating that the standard does not require courts to conclude that "minimal, ineffective, or belated efforts to respond to sexual harassment are not clearly unreasonable as a matter of law."). Nor is the district court's ruling consistent with the way courts around the country have interpreted the evidentiary threshold of deliberate indifference. *See Fairfax Cty.*, 1 F.4th at 273-74; *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d at 172-73; *Williams*, 477 F.3d at 1295-97 (11th Cir. 2007); *see also Doe v. Bibb Cty. Sch. Dist.*, 126 F. Supp. 3d at 1380 ("while the 'further discrimination' may be sexual harassment the plaintiff experienced, this need not be the case," and "further

discrimination" occurs when a school's deliberate indifference prevents the plaintiff from attending school).

Here, the District's efforts to respond were minimal – it issued a finding in support of Jane (A. 341-42), but issued it in a vacuum; it paid lip-service to Title IX without taking actual steps to make sure its recommendations were followed through.  This includes the District's failure to discipline M.P.  (A. 399). It failed to implement its own findings by failing to communicate them at all the administrators in charge of Jane's academic fate (A. 401, 406), and as such was entirely ineffective.  And the District's response was belated – belated in securing a safety transfer for Jane (A. 401), belated in taking any steps to correct her unexcused absences and academic record (A. 407-14).  Again, all of these acts and omissions caused Jane additional stress, anxiety and depression (A. 663-71).

Had these facts been considered and had appropriate deference been given to Jane as the non-movant, the district court would have had to find that she had produced sufficient evidence to have this claim submitted to a jury.  Given that these material facts were not considered and to the extent that they were, were not construed in a light favorable to Jane as required as this stage of litigation, the district court's ruling on Jane's Title IX claim should be reversed.

**2.** **The district court's conclusion that Jane did not present evidence sufficient to prove her retaliation claim likewise ignored salient facts in the record and drew inferences from the facts considered in favor of the non-movant in contravention of the summary judgment standard.**

In determining that Jane failed to produce evidence sufficient to prove retaliation because she did not produce evidence that James's conduct interfered with the District's or MPD's investigation into her sexual assault claim, the district court also ignored many of the same material facts that were disregarded in its analysis of the Title IX claim. Namely, the district court again erroneously found that James's reprehensible conduct at the June 14, 2017 meeting "stand[s] alone." (A. 1152). But again, this statement and her conclusions drawn therefrom, as it relates to the District's investigation into the sexual assault, again, does not take into consideration at all James's post-meeting conduct.

Retaliation against a person who "has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005). "Reporting incidents of discrimination is integral to Title IX enforcement and would be discouraged if retaliation against those who report went unpunished. Indeed, if retaliation were not prohibited, Title IX's enforcement scheme would unravel[.]" *Id.* at 180-81.

As in the Title VII context, a plaintiff asserting Title IX retaliation must "'establish three elements: that she made a charge or opposed a practice made

unlawful by Title [IX], and that the [school] took materially adverse action because of her protected conduct.'" *Cavalier*, 306 F. Supp. 3d at 36 (quoting *Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015). Reporting sexual harassment is a protected activity under Title IX. *See Jackson*, 544 U.S. at 174 ("When a funding recipient retaliates against a person because [she] complains of sex discrimination, this constitutes intentional discrimination' 'on the basis of sex,' in violation of Title IX."). A "materially adverse action" is one that "'might have dissuaded a reasonable [sexual assault victim like the plaintiff] from making or supporting a change of discrimination.'" *Cavalier*, 306 F. Supp. 3d at 36 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Whether an action is sufficiently "adverse" depends on context and the particular circumstances. *Burlington*, 548 U.S. at 69; *Cavalier*, 306 F. Supp. 3d at 36; *see also Doe v. Manor College*, 479 F.Supp.3d 151, 170 (E.D. Pa. 2020) (granting summary judgment for plaintiff as to adverse action where plaintiff demonstrated that Manor took several adverse actions against her including evicting her from her dormitory, sanctioning her, requiring her to attend counseling sessions, and threatening her with legal action).

Here, during the District's investigation of Jane's report of sexual assault, James herself viewed the video of the incident approximately one week later following her vacation. (A. 402). Despite the video plainly showing the assailant dragging

Jane into the restroom (A. 634), James mischaracterized the video to Pinder as Jane and the boy walking "hand-in-hand" into the restroom. (A. 402). In other words, James actually took steps after her review of and despite the indisputable video evidence to undermine Jane's report of sexual assault to her superiors and her request for transfer. As discussed *supra* at 32, James also failed to provide her or her staff's conclusions of the investigation to Howard when requested in order to corroborate the assault for purposes of this safety transfer. (A. 401). This behavior on the part of James caused a delay in the approval of Jane's transfer request (A. 401), which further caused her undue emotional distress and anxiety, and compounded her feelings that she was not being believed by the authorities about the sexual assault. (A. 663-71). And it is undisputed that James's actions were directly in response to Jane's report of the sexual assault on June 14, 2017.

Contrary to the district's court's assertion otherwise, the fact that the District, through Pinder, eventually disciplined James and secured Jane's requested safety transfer does not render James's conduct in response to Jane's report of sexual assault, null and void. And, it does not change the fact that the District, through James's reprehensible conduct both in the meeting and after, did in fact retaliate against Jane. *See Doe v. Sch. Bd. of Broward Cty.*, 604 F.3d 1248, 1255 (11th Cir. 2010) ("the highest-ranking school official on site" at the school, was "high enough on the chain-of-command to impute liability to the School Board"). At a

minimum, this evidence of adverse actions on the part of the District, through James's conduct, should be permitted to go to a jury given the delay it caused in securing Jane's transfer (A. 401), the hostility the Does were met with in requesting the transfer (A. 476), and the real consequences it caused to Jane's mental health over the course of those months waiting for the transfer (A. 663-71).

Likewise, some of the maltreatment Jane suffered once she transferred to Wilson likewise constitute adverse actions for reporting the sexual assault and filing her complaint, both protected actions. These include: Principal Martin's failure to take any steps to correct Jane's academic record once she became aware that Jane was a sexual assault victim around September 2018, after the filing of Jane's complaint; the continuous marking of unexcused absences between September 2018 and September 2019, once Wilson became aware of Jane's assault; the failure to correct Jane's academic and attendance record until September 2019 – over two years after she had been recommended to attend therapy as part of the Title IX findings; two teachers accusing Jane of using her sexual assault to get out of school; and the security guard's remarks concerning Jane's lawsuit. (A. 407-414).

These facts, combined with those of James's remarks at the June 14, 2017 meeting and her conduct post-meeting in relation to the investigation and transfer request, clearly demonstrate adverse actions on the part of the District, which would deter any victim from making a report and which retaliation claims are

designed to prevent.  Accordingly, the district court erred in finding that Jane could

not demonstrate adverse actions on the part of the District.

> 3. **The district court's rationale for dismissing Jane's intentional infliction of emotional distress claim is based on legal error and an incomplete version of the record because Jane was entitled to an inference that James's conduct towards her was intentional or reckless based upon the outrageousness of James's conduct.  When the law is correctly applied, Jane has presented ample evidence that James acted with intentional or reckless disregard towards her.**

The elements of intentional infliction of emotional distress consist of

(1) "extreme and outrageous" conduct on the part of the defendant, which

(2) intentionally or recklessly (3) causes the plaintiff "severe emotional distress."

*Bushrod v. Dist. of Columbia*, 521 F. Supp. 3d 1, 30 (D.D.C. 2021) (citing *Waldon*

*v. Covington*, 415 A.2d 1070, 1076 (D.C. 1980) *and* Restatement (Second) of Torts

§ 46 (1965)); *see also Larijani v. Georgetown University*, 791 A.2d 41, 44 (D.C.

2002); *Pitt v. District of Columbia*, 491 F.3d 494 (D.C. Cir. 2007).   As to the first

element, the conduct must be "so outrageous in character, and so extreme in

degree, as to go beyond all possible bounds of decency, and to be regarded as

atrocious, and utterly intolerable in a civilized community." *Kowalevicz v. United*

*States*, 302 F. Supp. 3d 68, 76 (D.D.C. 2018) (citing *District of Columbia v. Tulin*,

994 A.2d 788, 800 (D.C. 2010)); *see* Restatement § 46, cmt. d. The factfinder may

infer the existence of the second element—intent or recklessness—from the very

outrageousness of a defendant's conduct. *Bushrod*, 521 F. Supp. 3d at 30 (citing *Waldon*, 415 A.2d at 1077).

While district court agreed that James's comments during the June 14, 2017 were "appalling," and "completely in appropriate," it went on to inconsistently conclude that because it had found that James's conduct was not intentional or reckless, it need not reach the question of the whether the conduct was sufficiently atrocious or intolerable, or whether it caused Jane severe emotional distress. (A. 1125; 1163-65). This analysis, however, is backwards. The district court should have first engaged in an analysis of the outrageousness of the conduct prior to examining the intent. *See Waldon*, 415 A.2d at 1077 ("Of course, subjective intent can rarely be proven directly; therefore, the requisite intent must be inferred, either from the very outrageousness of the defendant's acts or, for example, when the circumstances are such that any reasonable person would have known that (emotional distress and physical harm) would result."). By analyzing James's intent prior to determining that her conduct was sufficiently outrageous, the district court deprived Jane of the reasonable inference that James's conduct was intentional or reckless. This constitutes legal error.

In order to prevail on a claim for intentional infliction of emotional distress, the defendant's conduct must be so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community." (A. 898-99, citing *Kaiser v. United States*, 761 F.Supp. 150, 156 (D.C. Cir. 1991) (quoting RESTATEMENT (SECOND) OF TORTS § at § 46)). "There are two primary components of extreme and outrageous conduct [the court] must consider: (1) applicable contemporary community standards of offensiveness and decency, and (2) the specific context in which the conduct took place, for in determining whether conduct is extreme or outrageous, it should not be considered in a sterile setting detached from the surroundings in which it occurred." *King v. Kidd*, 640 A.2d 656, 668 (D.C. 1983) (internal citations omitted). What is considered "extreme and outrageous" depends in large part on the prevailing norms of society: "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his [or her] resentment against the actor and lead him or her to exclaim, "Outrageous!" RESTATEMENT (SECOND) OF TORTS § 46 cmt. d. "In general, it is for the trier of fact to determine, taking into account changing social conditions and plaintiff's own susceptibility, whether the conduct was sufficient to constitute extreme outrage." *King*, 640 A.2d at 668 (citing *Contreras v. Crown Zellerbach Corp.*, 565 P.2d 1173, 1177 (1977)). "The extreme and

outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him [or her] actual or apparent authority over the other, or power to affect his [or her] interests."[6]  *Id.* (citing RESTATEMENT (SECOND) OF TORTS § 46 cmt. e).  "Courts carefully scrutinize a defendant's conduct where the defendant is in a peculiar position to harass the plaintiff, and cause emotional distress."  *Id.* (internal citations omitted).  "[T]he extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is particularly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity."  *Id.* (quoting favorably RESTATEMENT (SECOND) OF TORTS § 46 cmt. f).

James's statements and conduct are objectively outrageous by any societal standards.  (A. 898-99).  In fact, they are so outrageous that her own direct supervisor, Pinder, opened an investigation into her conduct once he listened to the audio recording and viewed the video footage himself.  (A. 530-33; 535-36; 636-41).  In his incident report, he deemed her comments and conduct "unprofessional," "reckless," and indicated that she had "endangered student safety."  (A. 636-41.)  The outrageousness of the conduct is further supported by the fact that James formally reprimanded for her conduct (A. 643-44); Julie Doe was "surprised, offended," and "disgusted" when she heard James' statements on

the recording (A. 496); James was aware of the allegation of sexual assault and Jane's fragile mental state at the time she made the comments (A. 124-28; 636-640).  And she had seen the video footage prior to mischaracterizing it to Pinder. (A. A. 530-36; 636-40).

These facts are similar to *Drejza v. Vaccaro*, 650 A.2d 1308 (D.C. 1994).  In that case, the plaintiff sued a detective assigned to investigate her allegations of rape for statements made by him to her during his investigation.  *Id.* at 1309-1311. The trial court dismissed the case on summary judgment finding that while the plaintiff's account of the defendant's statements were "obnoxious" and "boorish," as a matter of law, they were not sufficiently extreme to entitle the plaintiff to any relief. *Id.* at 1308.  The issue before the D.C. Court of Appeals was whether the detective's conduct while interviewing the plaintiff was "sufficiently severe and outrageous to entitle [the plaintiff] to a determination by a jury of the question whether she should recover damages for the intentional infliction of emotional distress."  *Id.*  "[T]aking the entire tone and flavor of the encounter into consideration," the Court concluded that "the record raised genuine issues of material fact precluding the entry of summary judgment."  *Id.* at 1309.  The Court reversed and remanded the case back to the trial court.

Material to the Court's decision in *Drejza* were the following circumstances that were not adequately considered by the trial judge in that case:  "[the plaintiff's]

44

emotional state immediately following a dehumanizing sexual assault on her, [the defendant's] knowledge of her susceptibility, and [the] position of authority and trust which [the defendant] occupied during his interaction with [the plaintiff]." *Id.* at 1312.  The Court reasoned that the plaintiff's special susceptibility to injured feelings following such an assault should be dispositive because "to hold otherwise would be to trivialize the dehumanizing consequences of rape." *Id.* at 1313 ("The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity.  The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know."). The Court also looked to the detective's position of authority over the plaintiff:  "He was an official, [the plaintiff] could reasonably suppose, who could be trusted to assist her and investigate her complaint in a professional and helpful manner." *Id.* at 1314.  Instead, the detective "abused the authority of his office to ridicule, bully, humiliate and insult her," just as James did here.  *Id*. ("Outrageous conduct may consist of '[the] abuse of [a] position of authority …'").

Like the trial court in *Drejza*, the district court also failed to consider the circumstances surrounding the conduct.  At all times in the record, James was in a clear position of authority over Jane.  She was her principal.  (A. 386). She knew

or should have known that Jane was peculiarly susceptible to emotional distress given the nature of her allegations and her behavior in the meeting. (A. 335; 384-85; 641). Jane should have been able to trust James, her principal, "to assist her and to investigate her claim in a professional and helpful manner." *Id.* Instead, her report of the assault was met with derision and disbelief. In many ways, Defendant James' conduct was even more appalling than that of the detective in *Drejza* because it did not stop with just comments. As discussed *supra* at 32, James took active steps to undermine the Jane's report of the sexual assault by making misrepresentations to her supervisors, and failing to provide candid and accurate information to Howard as it related to the transfer.

Accordingly, the district court had ample evidence upon which to find that James's conduct, both in the June 14, 2017 meeting and after, was outrageous and beyond the bounds of decency. Indeed, a ruling otherwise would undermine the district court's own statements concerning James's conduct, would wholly ignore the position of the parties relative to one another (principal – student), and the stated intent, or malice, behind the statements. (A. 335). Such a ruling would negatively reinforce the implicit bias contained in James's statements that victims who are brave enough to report a sexual assault to persons of authority should be met, not with compassion and care, but with skepticism and derision. This is exactly the kind of behavior that the D.C. Court of Appeals in *Drejza* sought to

discourage.  The court's failure to reach this analysis deprived Jane of the reasonable inference that James intended to cause her harm, or at a minimum acted with reckless disregard to her well-being.

In addition to failing to make a determination regarding the outrageousness of James's conduct, the district court again analyzed James's comments in a vacuum and did not take into consideration the full extent of James's conduct after the meeting when determining James's level of intent.  In particular, the district court completely ignored Pinder's statements that he believed James had deliberately mislead him during the investigation of the assault because of her personal suspicions towards Jane and her mother.  (A. 636-40). It also ignored Julie Doe's testimony regarding her impression of James's intent, both at the meeting and listening to the recording afterward.  (A. 496).  These facts, while relevant to outrageousness as described *supra* at 45-47, are also relevant in determining intent. Again, this is not a case of only isolated comments, as the district court has found, but one where a person of authority – a principal of a large public high school – has, according to her own supervisor, deliberately tried to undermine a student's report of sexual assault during an active investigation. The failure of the district court to analyze James's actions before and after the meeting requires reversal of its decision.

The record also makes clear that this mischaracterization of the assault by James to Pinder, as well as her subsequent failure to provide candid information to Howard about the assault during the transfer process, caused a delay in Jane securing a transfer from RHS, which caused her further psychological harm. *See* Argument *supra* at 32. Although the district court likewise did not analyze whether James's conduct caused Jane the severe emotional distress required for an intentional infliction of emotion distress claim, it is clear that Jane suffered tremendously as a result of this conduct:

1) The delay in transfer led to Jane experiencing additional anxiety and stress over the 2017 summer following the assault. (A. 663-71). Over that summer, "[Jane] began shrinking. She felt extremely betrayed by people in position of authority. So of course, you know, she became really, really distrusting. Again, she was a vibrant, outgoing lovely young lady. And I had to watch her shrink into a shell of not wanting to come out of her room. Wearing super baggy clothes because she didn't want to be branded as 'loose' or like she was asking to be sexually assaulted because of how she dressed. She could not believe that people she trusted treated her this way. They had a responsibility to her. And they not only failed her but they blamed her for being sexually assaulted. (A. 490).

2) Dr. Ryan testified that Jane Doe has struggled with, among other things, suicidal thoughts and behavior, distrust, insomnia, and recurrent and voluntary distressing memories, including the idea that she was to blame for the sexual assault she suffered because of how she was dressed, and of not being believed. (A. 836-54). When questioned about Jane's PTSD and whether the trauma was exclusively related to having experienced sexual violence, Dr. Ryan explained "I think that given the timing of the response of the school of, particularly Ms. James, that it's really impossible to tease out the two. Id. Dr. Ryan also testified that Jane's "PTSD symptomatology would not be as severe without the interactions with Ms. James and with what followed." Id.. She also

testified that "[the] interactions with Ms. James are part of the sequela of her being sexually assaulted in the school and that's what's caused her PTSD." Id.

Accordingly, Jane has demonstrated that James's conduct was a direct and substantial cause of her emotional distress, and that her resultant emotional distress was severe and pervasive. The district court's dismissal of Jane's intentional infliction of emotional distress claim should therefore be reversed.

**4. The district court erred in granting the Defendants' motions to dismiss as to Jane's claim of negligent infliction of emotional distress when it found that she had not pled a special relationship between herself and the Defendants. But Jane did plead a special relationship with Defendants along with facts sufficient to find that the Defendants did undertake an investigation of Jane's report of sexual assault. Accordingly, Defendants owed Jane a duty of reasonable care in carrying out that investigation.**

The district court's determination that Jane did not plead a special relationship between herself and the Appellees sufficient to survive a motion to dismiss her negligent infliction of emotional distress claim was clearly erroneous.

In *Hedgepeth v. Whitman Walker Clinic*, the Court, sitting en banc, unanimously held that

> a plaintiff may recover for negligent infliction of emotional distress if
> the plaintiff can show that (1) the defendant has a relationship with the
> plaintiff, or has undertaken an obligation to the plaintiff, of a nature
> that necessarily implicates the plaintiff's emotional well-being, (2)
> there is an especially likely risk that the defendant's negligence would
> cause serious emotional distress to the plaintiff, and (3) negligent
> actions or omissions of the defendant in breach of that obligation
> have, in fact, caused serious emotional distress to the plaintiff.

22 A.3d 789, 810-11 (D.C. 2011) (en banc) (expressly modifying the holding in

*Williams v. Baker*, 572 A.2d 1062 (D.C. 1990).

   The Court then further discussed the necessary relationship or undertaking

between a defendant and a plaintiff that can give rise to a duty to avoid causing

emotional harm to the latter.  Acknowledging that it was not creating an exhaustive

list of all the undertakings or relationships that could give rise to such a duty, the

Court espoused the general principle that the "relationship" or "undertaking" must

"implicate the plaintiff's emotional well-being."  *Id*. at 812 n. 39 (describing a

school-student relationship as one subset of special relationships recognized in the

common law) (internal citations omitted).  One such relationship is that between a

school and a student, as is the case here.  *Id.*; *see also District of Columbia v.

Royal*, 465 A.2d 367, 369 (D.C. 1983) (recognizing that the District owed a duty of

care for the protection of children in its schools); RESTATEMENT (THIRD) OF

TORTS § 46 cmt. d (referring to relationships where one person is in a position of

power or authority over the other and therefore has greater potential to inflict

emotional harm) (internal quotations omitted).

Whilst dismissing Jane's claim, the district court cited *Sibley v. St. Albans School*, and found that as in that case, Jane had not pled anything beyond the student-school relationship upon which to base her claim of negligent infliction of emotional distress. 134 A.3d 789 (D.C. 2016); (A. 902). But again, this is not true. Jane's complaint stated in relevant part:

> Jane Doe was a student at Roosevelt High School and was subject to the authority of Defendant James, her principal, and other agents or employees of the District of Columbia. As such, Defendants had a duty to protect Jane Doe from sexual harassment, assault, and discrimination. (A. 36-37).

> There was an especially likely risk that the mishandling of an investigation of a claim of sexual assault made by Jane Doe would cause serious emotional distress to her. (A. 37).

> On June 14, 2017, Julie Doe wrote an email to Defendant James and Superintendent David Pinder, reporting that Jane Doe had been sexually assaulted, and requesting assistance with the matter. (A. 21).

> Later on June 14, 2017, Julie Doe, along with Jane Doe, attended a meeting at the Roosevelt High School with Defendant James, Dean of Students Stevens, Assistant Principal Moss, and Guidance Counselor Butler. Mr. Stevens participated in the meeting by telephone. (A. 21).

> During this meeting, Defendant James asked for the identity of the perpetrator, where the incident occurred, and attempted to otherwise obtain a statement from Jane Doe. Defendant James indicated that MPD would be coming to the school to interview Jane Doe. (A. 22).

> During this meeting, Jane Doe became upset and left the room. Julie Doe followed her into the hallway directly outside of the conference room. Defendant James then stated to the others present that "this whole thing is going to blow up in her face," "that is why I am going to go the extra mile and call MPD because I am sick of her, sick and tired of her and her mom. So I am going to call MPD and have a long and drawn out email just so I can embarrass her..." She also stated to Mr. Stevens, who was listening by

telephone, "you should see the dress she has got on." During the conversation, Defendant James can also be heard laughing, and otherwise ridiculing Jane Doe. She finally says "since I [Defendant James] walked into this building, I immediately responded to what I knew was bullshit." (A. 22).

Jane Doe was then interviewed by Maurice Butler, who obtained a report of the assault from her. (A. 22).

Upon information and belief, after June 14, 2017, DCPS did not further investigate the sexual assault, other than turning over some video footage to the police officers involved in the criminal investigation. Defendants did not report any conclusion of any such investigation to Jane Doe or Julie Doe, and they did not institute any disciplinary measures or proceedings against M.P. Upon information and belief, Defendants never even interviewed M.P. (A. 23).

Defendants, through their agents and employees including Defendant James, *after learning of M.P.'s sexual assault against Jane Doe*, failed to adequately, appropriately, and impartially investigate the claims of sexual assault; failed to interview M.P.; failed to discipline M.P. in any manner or supervise his activities on school property; made reckless defamatory and slanderous comments about Jane Doe to other employees or agents of the District of Columbia; and otherwise failed to act reasonably under the circumstances. Defendants thereby breached their duties to Jane Doe in a manner that was likely to cause her severe emotional distress. (A. 37).

Assuming *arguendo* that the district court's reliance on *Sibley* was proper, and that Jane was required to plead "something more" in addition to the student-teacher relationship, the allegations set forth above more than indicate an "undertaking" by the Defendants to investigate Jane's report of sexual assault. The assault was reported; a meeting was convened; in the meeting Jane became upset (A. 22), hence giving indication that mishandling of the investigation of such a claim would cause her harm; police were called (A. 22); and, Jane was interviewed by a school

employee, Butler (A. 22). These facts, indicate that the District and James had undertaken an obligation to Jane to investigate her claim of sexual assault, and correspondingly, to do so in a reasonable manner.

The district court's reliance on *Sibley* was misplaced. While the *Sibley* court did indicate "[t]he relationship between a student and his school or the musical director of his choir program is not enough, without more, to impose the predicate duty of care for a claim of negligent infliction of emotional distress," the Court determined that the duty in that case was governed by a contract between the plaintiff and the defendants, and that based upon that contract, the plaintiff had no such claim for negligent infliction of emotional distress. *Sibley,* 134 A.3d at 798. Accordingly the case is inapposite here.

This case is more like *Cavalier*, which the district court paints as distinguishable. *Cavalier*, 306 F. Supp. 3d at 40. As in *Cavalier*, there was a specific undertaking here, namely the investigation of a sexual assault. And, absent in *Cavalier* but present here, is the fact that Jane was a child at the time the assault took place, rendering her especially vulnerable. *See Hedgepeth*, 22 A.3d at 811, 812 n. 39; *see also Royal*, 465 A.2d at 369.

Accordingly, Jane sufficiently pled facts which demonstrate a special relationship (student-school) between her and the Appellees, as well as a specific undertaking on the part of the Appellees, namely the investigation of her report of

sexual assault, which necessarily implicated her well-being.  It was clearly

foreseeable that either mishandling the investigation, or deliberately undermining

her report, would result in serious emotional distress.  The district court's dismissal

of Count V of Plaintiff's complaint therefore amounted to reversible error.

## Conclusion

The district court erred in granting Appellees' motions for summary judgment. In reaching it conclusions, the court ignored numerous salient facts and deprived Jane of the benefit of the inferences that could be drawn from those facts. Given the plethora of evidence in this case concerning deliberate undermining of Jane's sexual assault claims by James, and the District's failures to implement its own Title IX recommendations, there were sufficient factual bases to allow Counts I, II, and IV of Jane's Complaint to proceed to a jury. Likewise the district court erred in granting Appellees' motions to dismiss Count V of Jane's complaint at the motion to dismiss stage because she had adequately pled a claim of negligent infliction of emotional distress. For these reasons, the Court should reverse the judgment.

Dated: February 22, 2024

Respectfully submitted,

KOONZ MCKENNEY JOHNSON
 & DEPAOLIS LLP
By: */s/ Kasey K. Murray*
 Kasey K. Murray  D.C. Bar No. 1016186
 2001 Pennsylvania Ave., N.W.
 Suite 530
 Washington, D.C.  20006
 (202) 659-5500
 kmurray@koonz.com

*Counsel for Appellant*

**Certificate of Service**

This certifies that on February 22, 2024, an electronic copy of the Brief for

Appellant was served through the Court's ECF system on all counsel of record.

*/s/ Kasey K. Murray*
Kasey K. Murray

**Certificate of Compliance**

This certifies that the Brief for Appellant complies with the type-volume

limitation in Federal Rule of Appellate Procedure 28(a)(7)(B)(i) because the brief

contains 12,985 words, excluding exempted parts. The brief complies with the

typeface and type style requirements of Federal Rule of Appellate Procedure

32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface

using Microsoft Word 2013 in 14-point Times New Roman.

*/s/ Kasey K. Murray*
Kasey K. Murray

**STATUTORY ADDENDUM**

# Statutes and Regulations

28 U.S.C. § 1331 .......................................................................... Add. 1

28 U.S.C. § 1343(a)(3) ................................................................ Add. 1

28 U.S.C. § 1343(a)(4) ................................................................ Add. 1

28 U.S.C. § 1367 .......................................................................... Add. 1

28 U.S.C. § 1291 .......................................................................... Add. 2

20 U.S.C. § 1681(a). (Title IX) ................................................... Add. 2

**28 U.S.C. § 1331**

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

**28 U.S.C. § 1343(a)(3) & (4)**

  **(a)** The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

    **(3)** To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

    **(4)** To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.

**28 U.S.C. § 1367**

**(a)** Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

**28 U.S.C. § 1291**

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.


**20 U.S.C. § 1681**

**(a) Prohibition against discrimination; exceptions**
No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.