NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 23-7135

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

JANE DOE, by and through her next friend, JULIE DOE,
APPELLANTS,

V.

DISTRICT OF COLUMBIA, *et al.*,
APPELLEES.

ON APPEAL FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

**BRIEF FOR APPELLEES THE DISTRICT OF
COLUMBIA AND AQUEELHA JAMES**

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

GRAHAM E. PHILLIPS
Deputy Solicitor General
Office of the Solicitor General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6647
graham.phillips@dc.gov

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A.    *Parties and amici*.—Plaintiffs below and appellants here are Jane Doe, by and through her next friend, Julie Doe, and Julie Doe.  Defendants below and appellees here are the District of Columbia and Aqueelha James.  There were no amici curiae in the district court.

B.    *Rulings under review*.—The rulings of the district court (Berman Jackson, J.) under review are (1) the September 24, 2019 oral ruling dismissing counts 3, 5, 6, and 7 of plaintiffs' complaint, Appendix ("App.") 42 (minute entry), 868-914 (transcript); and (2) the September 14, 2023 Memorandum Opinion and Order granting summary judgment for defendants, App. 1123-65.  The opinion has not yet been reported but is available on Westlaw at 2023 WL 5974473.

C.    *Related cases*.—This case has not previously been before this Court or any other court.  Counsel is not aware of any related cases within the meaning of Circuit Rule 28(a)(1)(C).

# TABLE OF CONTENTS

STATEMENT OF THE ISSUES.............................................................................1

STATUTORY PROVISIONS INVOLVED ..........................................................3

STATEMENT OF THE CASE...............................................................................3

    1.    Factual Background...........................................................................3

        A.    M.P. sexually assaults Jane in a school bathroom in June 2017.....................................................................................3

        B.    Julie and Jane meet with Roosevelt administrators the next day, and Julie secretly records the meeting ...............................4

        C.    DCPS promptly provides the security footage to MPD.............7

        D.    DCPS promptly conducts a Title IX investigation, substantiates Jane's complaint, and proposes corrective actions ......................................................................................8

        E.    DCPS promptly lets Jane transfer schools...............................10

        F.    Pinder hears the secret recording, asks DCPS to investigate James's conduct, and arranges for Jane to transfer to Wilson......................................................................12

        G.    Though M.P. is not disciplined, Jane never again encounters him .........................................................................13

        H.    Jane struggles during her sophomore and junior years at Wilson ......................................................................................14

        I.    Jane files this lawsuit, and on three instances over two years, Wilson staff refer to Jane's assault..................................16

    2.    Procedural History.........................................................................17

        A.    Jane's complaint and the district court's dismissal of the NIED claim ..............................................................................17

B.      The summary judgment ruling....................................................18

STANDARD OF REVIEW ....................................................................22

SUMMARY OF ARGUMENT .............................................................23

ARGUMENT .........................................................................................26

I.      The District Court Properly Granted Summary Judgment On
        Jane's Title IX Deliberate Indifference Claim....................................26

        A.      The District's response did not cause Jane to undergo
                further harassment or make her vulnerable to it .......................28

        B.      The District did not respond to Jane's assault with
                deliberate indifference ...............................................................32

                1.      The District's response was not "clearly
                        unreasonable." ................................................................32

                2.      Jane's arguments about deliberate indifference lack
                        merit ................................................................................35

II.     The District Court Properly Granted Summary Judgment On
        Jane's Title IX Retaliation Claim.........................................................39

III.    The District Court Properly Granted Summary Judgment On
        Jane's Claim Of Intentional Infliction Of Emotional Distress............45

        A.      Principal James's comments during the June 2017 meeting
                do not support liability ...............................................................45

        B.      Principal James's subsequent conduct does not support
                liability ........................................................................................48

IV.     The District Court Properly Dismissed Jane's Claim Of
        Negligent Infliction Of Emotional Distress .........................................50

CONCLUSION ......................................................................................55

# TABLE OF AUTHORITIES*

*Cases*

*Allen v. Johnson*, 795 F.3d 34 (D.C. Cir. 2015) ......................................39

*Al-Tamimi v. Adelson*, 916 F.3d 1 (D.C. Cir. 2019) ...............................29

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................23

*Baloch v. Kempthorne*, 550 F.3d 1191 (D.C. Cir. 2008) ................... 21, 41

*Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397 (1997)....................32

*Cannon v. Univ. of Chi.*, 441 U. S. 677 (1979) ......................................26

*Carey v. Edgewood Mgmt. Corp.*, 754 A.2d 951 (D.C. 2000) ...............46

*Cavalier v. Catholic Univ. of Am.*, 306 F. Supp. 3d 9 (D.D.C. 2018).....................54

*Chi. Ins. Co. v. Paulson & Nace, PLLC*, 783 F.3d 897 (D.C. Cir. 2015)...............22

*City of Waukesha v. EPA*, 320 F.3d 228 (D.C. Cir. 2003) ......................44

*\*Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*,
    526 U.S. 629 (1999)........................ 18, 19, 20, 27, 28, 29, 31, 32, 33, 34, 35, 38

*District of Columbia v. Royal*, 465 A.2d 367 (D.C. 1983)......................52

*Doe ex rel. Doe v. Derby Bd. of Educ.*, 451 F. Supp. 2d 438 (D. Conn. 2006).......30

*Drejza v. Vaccaro*, 650 A.2d 1308 (D.C. 1994) ......................... 47, 48, 49

*Farmer v. Kan. State Univ.*, 918 F.3d 1094 (10th Cir. 2019).................30

*Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60 (1992)...................26

*Garrett v. Ohio State Univ.*, 60 F.4th 359 (6th Cir. 2023)......................39

---

\*      Authorities upon which we chiefly rely are marked with asterisks.

*Gebser v. Lago Vista Indep. Sch. Dist.,
  524 U.S. 274 (1998).......................................................... 27, 28, 33, 34, 38, 39, 42

Gross v. United States, 771 F.3d 10 (D.C. Cir. 2014) ............................................22

Harris v. Jones, 380 A.2d 611 (Md. 1977)..............................................................46

*Hedgepeth v. Whitman Walker Clinic,
  22 A.3d 789 (D.C. 2011) (en banc) ................................................. 18, 51, 53, 54

Jackson v. Birmingham Bd. of Educ., 544 U.S. 167 (2005) ...................................39

Karasek v. Regents of the Univ. of Cal.,
  No. 15-CV-3717, 2015 WL 8527338 (N.D. Cal. Dec. 11, 2015) ......................30

Kerrigan v. Britches of Georgetowne, Inc., 705 A.2d 624 (D.C. 1997)..................49

Lesesne v. District of Columbia, 146 F. Supp. 3d 190 (D.D.C. 2015) ...................52

M.S. ex rel. Hall v. Susquehanna Twp. Sch. Dist.,
  969 F.3d 120 (3d Cir. 2020) ................................................................................40

Ortberg v. Goldman Sachs Grp., 64 A.3d 158 (D.C. 2013)....................................50

Parada v. Banco Indus. De Venezuela, C.A., 753 F.3d 62 (2d Cir. 2014) .............42

Salazar v. S. San Antonio Indep. Sch. Dist., 953 F.3d 273 (5th Cir. 2017)............40

Saphir ex rel. Saphir v. Broward Cnty. Pub. Sch.,
  744 F. App'x 634 (11th Cir. 2018) .....................................................................39

Scott v. Harris, 550 U.S. 372 (2007) ......................................................................22

Sere v. Grp. Hospitalization, Inc., 443 A.2d 33 (D.C. 1982) .................................45

Shank v. Carleton Coll., 993 F.3d 567 (8th Cir. 2021)...........................................29

Sherman v. Regents of Univ. of Cal.,
  No. 20-CV-6441, 2022 WL 1137090 (N.D. Cal. Apr. 18, 2022)......................40

*Sibley v. St. Albans Sch., 134 A.3d 789 (D.C. 2016)................................ 18, 52, 53

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)............................ 39, 41

*Waldon v. Covington*, 415 A.2d 1070 (D.C. 1980) ................................................46

*Wamer v. Univ. of Toledo*, 27 F.4th 461 (6th Cir. 2022)........................................30

*Wood v. Neuman*, 979 A.2d 64 (D.C. 2009) ............................................................50

## *Statutes*

18 U.S.C. § 2511 ......................................................................................................5

18 U.S.C. § 2515 ......................................................................................................5

20 U.S.C. § 1681 .............................................................................................. 26, 28

20 U.S.C. § 1682 ....................................................................................................27

42 U.S.C. § 1983 ....................................................................................................32

42 U.S.C. § 2000e ..................................................................................................39

## *Regulations*

Calvert Magruder, *Mental and Emotional Disturbance in the Law of Torts*,
    49 Harv. L. Rev. 1033 (1936)..........................................................................47

Emily Suski, *Subverting Title IX*, 105 Minn. L. Rev. 2259 (2021)........................33

Restatement (Second) of Torts § 46 (Am. L. Inst. 1965) ..................... 45, 46, 47, 48

Restatement (Third) of Torts § 46 (Am. L. Inst. 2012) ..........................................52

## *Rules*

Fed. R. Civ. P. 12 ...................................................................................................17

Fed. R. Civ. P. 56 ...................................................................................................22

# GLOSSARY

App.            Appendix

Br.             Appellants' opening brief

DCPS            District of Columbia Public Schools

IIED            Intentional infliction of emotional distress

MPD             Metropolitan Police Department

NIED            Negligent infliction of emotional distress

RD              ECF Record Document

# STATEMENT OF THE ISSUES

At the end of her freshman year of high school, appellant Jane Doe was sexually assaulted by a fellow student, M.P., in a school bathroom. Jane and her mother, Julie Doe, met the next day with school administrators, including the principal, appellee Aqueelha James. Julie secretly recorded the meeting on her phone. This recording included several minutes when Jane and Julie were out of the room, during which Principal James called Jane's allegations "bullshit" and said she was calling the police to "embarrass" Jane. James nonetheless directed her staff to conduct a "proper investigation" and ensure that relevant security footage was preserved. A subsequent Title IX investigation by the District of Columbia Public Schools ("DCPS") substantiated Jane's sexual assault allegation and proposed several remedial measures, including the option for Jane to transfer schools. Jane agreed to a transfer, and she never encountered M.P., nor was she sexually harassed, again. She did, however, struggle emotionally and academically at her new high school, which she alleged repeatedly mischaracterized absences as unexcused, including absences for therapy appointments related to the assault.

Jane eventually sued James and the District of Columbia, alleging (as relevant here) deliberate indifference and retaliation under Title IX, intentional infliction of emotional distress ("IIED"), and negligent infliction of emotional distress ("NIED"). The district court (Berman Jackson, J.) dismissed the NIED claim for failure to state

a claim and later granted summary judgment to James and the District on the remaining claims. The issues on appeal are:

1. Whether the grant of summary judgment on Jane's Title IX deliberate indifference claim should be affirmed, either because (a) Jane offered no evidence that the District's response to her sexual assault caused her to undergo further harassment or made her vulnerable to further harassment, or because (b) the District's response was not a "clearly unreasonable" effort to prevent further sexual harassment.

2. Whether the grant of summary judgment on Jane's Title IX retaliation claim should be affirmed because the incidents of retaliation that Jane has alleged on appeal were either not raised in the district court (and thus forfeited), not materially adverse actions, or not caused by any retaliatory motive.

3. Whether the grant of summary judgment on Jane's IIED claim should be affirmed because Principal James's conduct was neither "extreme and outrageous" under District law nor intended to cause Jane severe emotional distress.

4. Whether Jane's NIED claim was properly dismissed because the complaint failed to allege the necessary predicate of a special relationship or undertaking whose purpose was to care for Jane's emotional wellbeing.

## STATUTORY PROVISIONS INVOLVED

All applicable statutes are reproduced in the addendum to Jane's opening brief.

## STATEMENT OF THE CASE

### 1. Factual Background.

Resolving genuine disputes in Jane's favor, the summary judgment record reflects the following facts.

#### A. M.P. sexually assaults Jane in a school bathroom in June 2017.

June 13, 2017 was the second-to-last day of classes at Roosevelt High School, a public high school within DCPS. Jane was a freshman at Roosevelt. App. 608. During a mid-day class, Jane lent her phone charger to a male student, M.P., who then refused to return it. App. 608-09. M.P. left the classroom and Jane followed him down a hallway, repeatedly asking him to return the charger. App. 609. As they neared a boys' bathroom at the end of the hallway, M.P. grabbed Jane and pulled her toward the bathroom. App. 609. A security camera in the hallway recorded the incident: the footage depicts Jane visibly resisting, pulling away forcefully, but M.P. drags her inside by her arms. App. 635 (video file) (internal timestamp 12:49:10 to 12:49:42).

Once in the bathroom, M.P. pushed Jane into a stall. App. 609. He groped her breasts and buttocks, tried to lift her dress, and kissed and sucked her neck so forcefully that he left a mark. App. 609. Jane yelled at him to stop, hoping

somebody in the hallway would hear. App. 609. After several minutes, M.P. abruptly stopped and, without saying anything, let her go. App. 611. Jane left the bathroom, walking away quickly with her charger; M.P. exited roughly 30 seconds later. App. 635 (video file) (internal timestamp 12:53:00 to 12:53:33).

Jane immediately called her mother, Julie. App. 611. She told her mother what had happened and asked for permission to come home. App. 611. Julie said yes, and Jane went straight home without speaking to any teacher or administrator. App. 611-12.

### B. Julie and Jane meet with Roosevelt administrators the next day, and Julie secretly records the meeting.

Shortly before 4 p.m. the following afternoon (the last day of the school year), Julie sent an email to Aqueelha James, Roosevelt's principal, and her supervisor, David Pinder, the superintendent responsible for Roosevelt (and various other high schools). App. 642. Julie informed them that "[a] young man, with the name [M.P.'s nickname] pulled my daughter into a male restroom yesterday and sexually assaulted her." App. 642. Julie said she would be passing by the school and would "appreciate [their] assistance with this matter." App. 642. She asked that no one speak to Jane about the incident "without my presence," noting that Jane was "extremely emotional." App. 642.

Jane and Julie came to Roosevelt later that afternoon to discuss the incident. App. 365-66. They met with James in a conference room near the school's main

office. App. 366. Also present were Assistant Principal Michael Moss and intervention coach Maurice Butler. App. 366. Reginald Stevens, Roosevelt's dean of students, participated by phone. App. 366. Unbeknownst to anyone else, Julie was recording the conversation on her phone, which she placed on the conference table. App. 370; *see* App. 335 (audio recording filed as exhibit).[1]

Almost immediately after the meeting began, James directed Moss to call the Metropolitan Police Department ("MPD") about the incident. App. 367. Moss left the meeting and did so. App. 367. James asked Jane about the incident, including the identity of her assailant (since Julie's email had used a nickname) and where the incident had occurred. App. 366-67; Audio Recording 4:45 to 6:38. To Jane, James's tone and statements felt "disrespectful" and "insensitive." App. 614. Jane became upset and left the room. App. 367. Julie left to speak with Jane in the hallway, but she left her phone (which was still recording) in the conference room. App. 367, 370.

Principal James viewed Julie as a longtime critic of James and of Roosevelt, and James believed that Julie wanted her daughter to go to a different school. *See*

---

[1] In the district court, James argued that this recording was inadmissible because it was made in violation of the Federal Wiretapping Act, 18 U.S.C. §§ 2511, 2515. The district court concluded that James was entitled to summary judgment in any event, so it did not resolve this issue. App. 1162 & n.22. James reserves the right to renew this argument if this Court remands any of the claims against her.

App. 104-10, 118-20. While the Does were out of the room, James expressed irritation and skepticism of Jane's allegations:

> This whole thing is going to blow up in her face, that is why I am going to go the extra mile and call MPD . . . because I am sick of her, sick and tired of her and her mom. So I am going to call MPD and have a long and drawn out email just so I can embarrass her ass. . . . You should see the dress she's got on. . . . [S]ince I walked into this building, I immediately responded to what I knew was bullshit.

Audio Recording 9:34 to 9:50, 10:05 to 10:12, 11:05 to 11:10. James did not intend for Jane or Julie to hear these statements, and they did not (until later listening to the recording). App. 368-71.

Several minutes later, Jane agreed to speak one-on-one with Butler. App. 372; Audio Recording 16:55 to 17:10. She told Butler her assailant's name and recounted the circumstances of the assault in greater detail. Audio Recording 17:30 to 22:15. Shortly after, MPD officers arrived at the school. App. 373. After some preliminary discussion, the officers agreed to speak with Jane at home, rather than at Roosevelt. Audio Recording 26:40 to 30:15. Jane, Julie, and the MPD officers left the school and walked to the Does' nearby home. App. 373; Audio Recording 30:15 to 36:00. Detectives from MPD's Youth and Family Services Division interviewed both Jane and Julie that evening. App. 59-60.

After escorting Jane home, Julie returned to Roosevelt and spoke further with James and Butler. During this conversation, Julie acknowledged that she had separately spoken with Superintendent Pinder about the assault and her desire for

Jane to attend a different school. Audio Recording 53:30 to 54:10. In that conversation, Pinder had already offered to let Jane transfer to Cardozo High School for the following year. Audio Recording 53:30 to 54:10. Julie said that option was unacceptable because Cardozo was "gang-infested." Audio Recording 54:00 to 54:10. Butler asked if she would consider Coolidge High School, but she dismissed it as "gang-infested too." Audio Recording 54:50 to 55:01.

### C. DCPS promptly provides the security footage to MPD.

That same evening, James called Superintendent Pinder to ensure that he was aware of the incident. App. 374. According to Pinder, James said that she did not believe the accusation. App. 530. Nonetheless, it is undisputed that, before leaving for a vacation the next day, James instructed Dean Stevens to conduct a proper investigation and in particular to gather any security camera footage. App. 307, 921; *see* App. 139 (noting James's vacation). She also followed up by email with Julie, noting that MPD would continue its investigation, Roosevelt would review the security camera footage, and Butler would "provide you with counseling options to help your daughter during this traumatic time." App. 55.

The next day, consistent with James's instruction, DCPS personnel reviewed the security camera footage and arranged for it to be copied. App. 564, 699-700. DCPS transmitted the footage to MPD the following day. App. 60. James did not see the footage before leaving for vacation. App. 141-42.

Shortly after returning from her vacation, on June 26, James sent a brief description of the incident to Jane Spence, DCPS's Chief of Secondary Schools. App. 703, 818. "I spoke with my Intervention Coach [i.e., Butler] a few minutes ago," James wrote, "and he informed me that Jane Doe (rising 10th grader) told him that the boy kept trying to hold her down and kiss her." App. 703; *see* App. 463.

### D. DCPS promptly conducts a Title IX investigation, substantiates Jane's complaint, and proposes corrective actions.

The week after Jane reported the assault, DCPS's Title IX coordinator, Lynice Hannah, began an investigation of the incident. App. 583. Within days, Hannah emailed Julie to introduce herself and to seek the Does' input: "I want to discuss what occurred, so that we can do an investigation and provide supports to your daughter. I am here to listen and to help you. DCPS does not tolerate discrimination or harassment of any kind and certainly not of a sexual nature, so we take this claim very seriously!" App. 1031-32. Over the following weeks, Hannah and Julie corresponded by email and spoke by phone. App. 1028-32. Hannah kept Julie apprised of the steps she was working on, including "[s]etting up counseling" for Jane and working with Superintendent Pinder "about your school transfer request." App. 1028. Hannah informed Julie that, at the end of the Title IX investigation, "you will get a resolution letter outlining what we found and any action items that DCPS will engage in as a result of any findings of our inquiry into the allegations." App. 1028.

Hannah sent the Does the resolution letter on July 17, 2017. App. 341. In it, DCPS concluded that, more likely than not, Jane had suffered sexual harassment in the form of M.P.'s assault. App. 341. The letter catalogued several corrective actions that DCPS was implementing, including letting Jane participate in a summer employment program "in which she will earn 100 community service hours and pay," providing "support and counseling services over the summer" through a nonprofit, and extending the deadline for Jane to apply for DCPS's selective "application schools." App. 341. The letter also memorialized a "phone conference" between Julie and Pinder "in which he honored your request for a transfer and offered" a choice of three high schools Jane could attend the following school year: Phelps A.C.E. High School, Eastern High School, or Cardozo. App. 341.

The letter also recommended additional corrective actions for the future. App. 341-42. These included providing Roosevelt students with "materials on healthy relationships," further counseling for Jane, and Roosevelt pursuing discipline against M.P. App. 341-42. Most importantly, the letter proposed creating a "safety plan" that would entail "full separation" between Jane and M.P. "throughout the entire 2017-18 [school year] in the event you do not choose one of the schools offered by [Superintendent] Pinder and [M.P.] returns to Roosevelt." App. 342.

Jane asserts that the Does did not receive this letter. Br. 11; App. 664. But as the District noted (without contradiction) in the district court, it was *Jane* who produced this document in discovery, not the District. *See* ECF Record Document ("RD") 78-2 at 4 (¶ 25).

### E. DCPS promptly lets Jane transfer schools.

Simultaneously with the Title IX investigation, DCPS also took steps to permit Jane to transfer schools. In summer 2017, Milo Howard was a specialist in DCPS's student placement office. App. 675. He explained that DCPS could provide a "victim" or "safety" transfer for a student who was the victim of a crime. App. 676; *see* App. 677 (noting that "safety" transfer is not distinct from "victim" transfer). Either the student's current school or their parent could request such a transfer. App. 676. The placement office would normally require substantiating documentation, such as a police report, a letter from the Office of the Attorney General, or the result of a compliance investigation by DCPS's grievance office (where Hannah worked). App. 677. The ultimate decision to permit a transfer belonged to the relevant superintendent. App. 677. And, importantly, the ultimate decision on *which school* the student could transfer to likewise belonged to the superintendent—not to Howard. App. 678.

In Jane's case, as noted above, Superintendent Pinder swiftly agreed to let her transfer out of Roosevelt. Indeed, Julie's secret recording reveals that by June 14,

the day after the assault, Pinder had already offered at least one transfer option (Cardozo). Audio Recording 53:30 to 54:02. By mid-July, Pinder had offered at least four transfer options: Cardozo, Phelps, Eastern, and Columbia Heights Education Campus. App. 341, 688-90.

The Does did not accept any of these options. In their view, these schools "were just as unsafe as Roosevelt, if not even more unsafe." App. 665. (The record contains no data, or even anecdotes, about instances of violence at these schools.) Instead, the Does wanted Jane to attend either Woodrow Wilson High School or School Without Walls High School. App. 665.

In a mid-July email exchange, Howard asked Pinder and James about "the outcome of the MPD investigation. Were charges filed against the aggressor? Was the allegation determined to be 'unsubstantiated'?" App. 687. James in turn sought an update from a Roosevelt administrator, who related that, per MPD, "[t]he case was presented to the Attorney General and they declined prosecution." App. 686. But in the same exchange, Pinder made clear that, regardless of the outcome of the criminal investigation, he would approve a transfer based on Julie's safety concerns. App. 686 ("Either way Milo I will approve a transfer based on mom's concerns in general around safety.").

**F.** **Pinder hears the secret recording, asks DCPS to investigate James's conduct, and arranges for Jane to transfer to Wilson.**

Julie eventually sent a copy of her secret recording of the June 14 meeting to Pinder, who listened to it in mid-August. App. 486, 639. Pinder found James's comments when the Does were out of the room "concerning for several reasons," which he memorialized in an incident report. App. 639.

> First, it is the responsibility of the principal to take all allegations of misconduct very seriously and to ensure that these investigations are conducted professionally and without malice towards any student. Additionally, MPD or other legal divisions should never be used to embarrass or humiliate a student, but rather to conduct a fair and impartial investigation of the facts.

App. 639. Pinder also wrote that he had now watched the security footage from the hallway and believed that James "was not transparent with me about the nature of this incident." App. 640. In prior conversations with James, he said, "she indicated to me that there was no evidence on the video of an assault," and that instead "it appeared that the young man and Jane were hand-in-hand and entered the bathroom mutually." App. 639. But the video made clear that "the young man pulled Jane in the bathroom against her will" and that "she was upset/visibly anxious" when she exited. App. 639. Pinder asked DCPS to conduct "a formal investigation into Principal James' conduct in responding to this allegation." App. 641.

DCPS conducted this investigation and issued James a written reprimand in November 2017. App. 644. The reprimand explained that DCPS had "uncovered

an audio recording of [James] making inappropriate comments" and noted that James "admitted to investigators that [she] was expressing [her] frustrations and that [her] comments were unprofessional." App. 644. The reprimand reproved James for her "failure to meet [her] professional duties and responsibilities" and became part of her official personnel file. App. 644.

After seeing the security footage in August, Pinder asked the superintendent responsible for Wilson, Drewana Bey, to allow Jane to transfer there for the upcoming school year. App. 926. Bey agreed. App. 926. Howard was not involved in approving the transfer. App. 683. The transfer was approved roughly a week before the start of Jane's sophomore year. App. 621.

## G. Though M.P. is not disciplined, Jane never again encounters him.

As a result of the Title IX investigation, Hannah sent a letter to M.P.'s family in mid-July 2017. App. 1033-34. Hannah noted that despite "various attempts to contact the phone numbers, email and home addresses we have on file for [M.P.]," DCPS had been unable to speak with him about the incident. App. 1033. Hannah explained that the investigation had found that more likely than not M.P. had sexually harassed Jane. App. 1033. The letter proposed several corrective actions, including a "safety plan" for the coming year "to ensure full separation between" M.P. and Jane, as well as "Chapter 25 Discipline protocol from Roosevelt administration for [M.P.]," App. 1033—a reference to the chapter of Title 5-B of the

D.C. Municipal Regulations that governs student discipline by DCPS. Hannah's letter to M.P.'s family was returned as undeliverable. App. 1035.

M.P. did not return to Roosevelt for the 2017-2018 school year but instead attended Anacostia High School, another DCPS school. App. 596. Although Anacostia administrators were informed of the incident between M.P. and Jane, M.P. was not disciplined. App. 597-98. No Anacostia administrators were deposed in this case, and the record does not reveal why M.P. was not disciplined. *See* Br. 33 (calling lack of discipline "inexplicabl[e]"). There is no evidence, however, that Jane ever encountered M.P. again after transferring to Wilson, or even feared that she would. And by her own account, "nothing like that situation happened again." App. 627.

## H. Jane struggles during her sophomore and junior years at Wilson.

During Jane's first year at Wilson (2017-2018), neither the principal, Kimberly Martin, nor any other Wilson staff knew that Jane had been sexually assaulted at Roosevelt. App. 406; *see* App. 710-11. Jane considered Wilson "a better school than Roosevelt," but she "struggled in different ways," including not trusting teachers and administrators. App. 665. Jane "had a hard time focusing on schoolwork because [she] felt sad and depressed a lot of the time, especially in [that] first year" at Wilson. App. 665.

Throughout this year, Jane was frequently absent from school, missing a total of 74 days.  App. 722.  Wilson marked 48 of those absences as unexcused, App. 722, but Jane later disputed that number, asserting that in all but seven instances she had a valid excuse, *see* App. 668-70.  Many of these absences were due to appointments for therapy.  App. 665, 670.

As in her sophomore year, Jane was frequently absent in her junior year.  By October 19 of that year, she already had 20 absences, 13 of which DCPS deemed unexcused.  App. 791.  The Does filed a grievance, asserting that DCPS was failing to excuse absences caused by medical appointments.  App. 794.  The grievance team found this complaint unsubstantiated, App. 796, and Superintendent Bey likewise denied the Does' administrative appeal, App. 799-800.  By the end of the school year, Jane had missed 106 days, 56 of which DCPS originally deemed unexcused absences.  App. 804.  After the Does filed another grievance in July 2019 (the summer before her senior year), DCPS acknowledged that it had wrongly marked 10 absences as unexcused on days when Jane had a recurring therapy appointment.  App. 821-22.  DCPS also amended her U.S. History grade, which had been an F based on unexcused absences, to a C-.  *Compare* App. 804-05 (report card dated July 30, 2019), *with* App. 825 (transcript dated January 28, 2020).

**I.    Jane files this lawsuit, and on three instances over two years, Wilson staff refer to Jane's assault.**

In September 2018, shortly after the start of her junior year, Jane filed this pseudonymous lawsuit.  App. 3.  A few days later, the Washington Post published an article about Jane's case, likewise using a pseudonym.  *See* Peter Jamison & Perry Stein, *D.C. Principal Was Taped Mocking Student's Sex Assault Claim, Lawsuit Says*, Wash. Post (Sept. 27, 2018), https://tinyurl.com/yjfx464k.  After this article came out, Martin and other Wilson administrators realized that Jane was the student who had been assaulted at Roosevelt.  App. 711.

Over the next two years (her junior and senior years), Wilson staff adverted to Jane's assault on three occasions.  First, early in her junior year, a security guard approached Jane and said, "oh, you're the girl from Roosevelt that was sexually assaulted."  App. 623.  After Jane informed DCPS of this remark, DCPS had the guard "replaced due to breach of student confidentiality."  App. 795.  Second, also in her junior year, a teacher named Ms. Ward told Jane that she couldn't use the assault "as an excuse" and needed "to get over it."  App. 623.  Third, in her senior year, a teacher named Mr. Hartberger told Jane to stop using the assault as an excuse to get out of class.  App. 498.  There is no evidence that Jane reported Ward's or Hartberger's comments to any Wilson administrator.

## 2. Procedural History.

### A. Jane's complaint and the district court's dismissal of the NIED claim.

Jane filed this suit in September 2018, naming as defendants both the District and Principal James. App. 17. Her complaint contained four counts that remain relevant on appeal. First, Jane alleged that the District responded to her sexual assault with deliberate indifference, violating Title IX. App. 28-31. Second, she alleged that James's comments and other aspects of the District's response to the sexual assault constituted unlawful retaliation under Title IX. App. 31-32. Third, she alleged that James's conduct amounted to IIED, for which the District was vicariously liable. App. 35-36. Fourth, she alleged that, alternatively, James's conduct amounted to NIED, for which the District was again vicariously liable. App. 36-37.

The District and James moved to dismiss all four of these counts under Federal Rule of Civil Procedure 12(b)(6), but the district court largely denied that request. In an oral ruling, the court held that Jane had at least plausibly pleaded the first three counts, which could proceed to discovery. *See* App. 876-86 (Title IX deliberate indifference), 886-88 (Title IX retaliation), 898-901 (IIED). The district court did, however, dismiss Jane's NIED claim. App. 901-03. The court explained that, under District law, the first element of an NIED claim is "that the defendant has a relationship with the plaintiff or has undertaken an obligation to the plaintiff of a

nature that necessarily implicates the plaintiff's emotional well-being." App. 901 (citing *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789 (D.C. 2011) (en banc)). Case law further establishes "that the relationship between a student and her school is not enough, without more, to impose the predicate duty of care" for NIED. App. 902 (citing *Sibley v. St. Albans Sch.*, 134 A.3d 789 (D.C. 2016)). Because Jane had not "alleged that defendant James or the District undertook a specific obligation to protect her, either before or after the assault took place," but was instead relying on "basically just the school-student relationship," she failed to state an NIED claim. App. 903.

## B. The summary judgment ruling.

After discovery, the District and James moved for summary judgment. The district court granted their motions, ruling in their favor on each of the three remaining counts. App. 1124-65.

*First*, the court held that Jane's claim of Title IX deliberate indifference failed. App. 1137-47. School districts are liable in damages for student-on-student sexual harassment "'only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.'" App. 1138 (quoting *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999)). And school

districts "'are deemed deliberately indifferent to acts of student-on-student harassment only where [their] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.'" App. 1139-40 (quoting *Davis*, 526 U.S. at 648). The district court held that, even viewing the facts in the light most favorable to Jane, she failed to show that the District's response to her sexual assault was "clearly unreasonable." App. 1140. The court explained its conclusion by examining the actions of Roosevelt and Wilson administrators in turn.

It was undisputed, the court noted, that Roosevelt administrators promptly met with the Does; that James directed Assistant Principal Moss to call the police and instructed Dean Stevens to conduct a "proper investigation"; and that DCPS's grievance team quickly began a Title IX investigation, which substantiated Jane's complaint. App. 1141. Given these actions, a jury could not find deliberate indifference. App. 1141. The court then rejected Jane's primary argument—which she has abandoned on appeal—that James "likely interfered with law enforcement's investigation and the potential criminal prosecution" of M.P. App. 1141 (quoting Jane's summary judgment opposition). Jane had not produced "any evidence of actual interference with [MPD's] investigation," App. 1141, and any alleged attempt to mislead Superintendent Pinder was unsuccessful, App. 1142. The court also rejected Jane's argument that the failure to discipline M.P. made the District's response clearly unreasonable, noting that the assault occurred at the very end of the

school year, DCPS then could not reach M.P., and DCPS ensured that Jane and M.P. would be separated the following year. App. 1144. In sum, "the District took swift steps to summon the police to investigate the sexual assault; it investigated both the attack and Principal James's remarks internally; and it offered emotional support to Jane and transferred her to the school of her choosing." App. 1145.

As for Wilson officials, Jane again failed to produce "evidence to show that they acted with 'deliberate indifference' such that the District could be found to have effectively 'cause[d] the discrimination.'" App. 1145 (quoting *Davis*, 526 U.S. at 642-43). The disputes about which of Jane's absences should have been excused were not material, since "the District provided her with opportunities to make up the lost classroom time with make-up assignments, and it went a step further by offering extensions on the assignments and tutoring services." App. 1146. And the security guard's stray "inappropriate comment" was not enough to show the sort of "pervasive harassing atmosphere" necessary for Title IX liability. App. 1146-47.

*Second*, the district court rejected Jane's Title IX retaliation claim. App. 1147-62. Title IX retaliation claims, the court explained, are analyzed in the same manner as Title VII retaliation claims. App. 1147-48. The plaintiff must therefore show "[1] that she made a charge or opposed a practice made unlawful by Title IX, [2] that the school took a materially adverse action against her, and [3] that the school

took the action because of her protected conduct." App. 1148. The acts of neither the Roosevelt administrators nor the Wilson administrators met this standard.

To begin, the court concluded that while James's remarks on the secret recording were "completely inappropriate" and "ugly," they did not rise to the level of a "materially adverse action" for purposes of Title IX retaliation. App. 1151 (citing *Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008) (noting that "sporadic verbal altercations or disagreements do not qualify as adverse actions for purposes of retaliation claims")). The court then explained at length why the evidence did not support Jane's now-abandoned theory that James interfered with MPD's investigation. App. 1152-59. Last, the court rejected the argument that DCPS had retaliated by denying Jane a transfer given that, in fact, DCPS *granted* Jane a transfer to the school of her choice. App. 1159.

The district court was also unpersuaded that anyone retaliated against Jane at Wilson. No one at Wilson even knew that Jane had reported a sexual assault during her first year there. App. 1160-61. And Wilson's treatment of her many absences during her junior year—"provid[ing] her with the opportunity to make up missed assignments and offer[ing] tutoring services"—did not amount to a materially adverse action. App. 1160. Even if it did, the school had a legitimate nondiscriminatory reason for its actions: "she had missed significant time from school." App. 1161.

*Third*, the district court held that Jane's IIED claim failed. App. 1162-65. IIED requires the defendant to have *intentionally* (or at least recklessly) caused the plaintiff extreme emotional distress. App. 1163-64. But the undisputed evidence showed that Principal James did not intend for Jane to hear her secretly recorded comments. App. 1164. "Because there was no way for James to have known that [Jane] would hear the recorded remarks at any point," James lacked the requisite intent. App. 1164. The court thus found it unnecessary to address the other elements of IIED. App. 1165.

## STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment de novo. *See, e.g.*, *Chi. Ins. Co. v. Paulson & Nace, PLLC*, 783 F.3d 897, 900 (D.C. Cir. 2015). Summary judgment is appropriate if the evidence in the record shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this determination, the Court views the facts and draws reasonable inferences in the light most favorable to the party opposing the summary judgment motion. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

The Court also reviews de novo a dismissal for failure to state a claim. *See, e.g.*, *Gross v. United States*, 771 F.3d 10, 12 (D.C. Cir. 2014). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to

state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

## SUMMARY OF ARGUMENT

The sexual assault that Jane endured on June 13, 2017 was a terrible ordeal that deserves unqualified condemnation. No student should have to fear such an attack in their school. That Jane was seriously traumatized is as understandable as it is regrettable. The issue before this Court, however, is whether the District and James are liable under specific legal theories for their *responses* to that assault. They are not.

1. Jane's Title IX deliberate indifference claim is governed by the Supreme Court's decision in *Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629 (1999). Under *Davis*, a school district is liable in damages for student-on-student sexual harassment only in limited circumstances. Among other things, once the school district has actual knowledge of the peer harassment (1) it must respond with deliberate indifference, and (2) that indifference must cause the student to undergo further harassment or make her vulnerable to such harassment. Neither requirement is satisfied here.

Taking the second of these elements first, there is no evidence that the District's response to Jane's assault caused her to experience further harassment or made her vulnerable to such harassment. Indeed, although Jane acknowledges this

requirement in her opening brief, she makes no effort to explain how it is met here, thereby forfeiting any possible argument. In any event, Jane herself testified that she never experienced further harassment, and she was not made vulnerable through exposure to M.P., as there is no evidence she ever encountered him again.

In addition, the District's response was not deliberately indifferent. Deliberate indifference exists only where a school district's response is clearly unreasonable—specifically, clearly unreasonable as means of preventing further sexual harassment. The District's response here—promptly calling the police, investigating the allegation, and granting Jane's request to transfer schools—was an entirely reasonable, and successful, effort to prevent further sexual harassment of Jane. Jane's counterarguments lack merit as they misconstrue both the deliberate indifference standard and the record.

2. Jane's Title IX retaliation claim also fails. To establish Title IX retaliation, a plaintiff must show that she made a charge or opposed a practice made unlawful by Title IX; the defendant took a materially adverse action against her; and the but-for cause of the defendant's action was a desire to retaliate. And because vicarious liability for damages is not allowed under Title IX, the school district itself must have notice of, and be deliberately indifferent to, the retaliatory act.

None of the incidents of supposed retaliation that Jane identifies on appeal satisfy this test. To start, Jane failed to raise many of these incidents in the district

court, forfeiting these points.  In any event, the incidents were not serious enough to qualify as materially adverse; there is no evidence of retaliatory intent; and DCPS was not deliberately indifferent to the issues brought to its attention.

3.  Jane's IIED claim based on Principal James's alleged misconduct fails.  As for James's secretly recorded comments, it is undisputed that she did not intend or expect Jane to hear them.  James therefore lacked the culpable state of mind (intent or recklessness) required to prove IIED.  In addition, though unkind and insensitive, James's comments—made in private, not in front of Jane—do not qualify as extreme and outrageous under District law.

None of James's subsequent actions or inactions can sustain an IIED claim either.  None were extreme and outrageous: indeed, her actions the summer after the incident constituted reasonable efforts to investigate and respond to the sexual assault.  There is no evidence that James intended to inflict serious distress on Jane.  And there is no evidence that James's conduct in fact caused serious distress of the kind necessary for IIED—only that, at most, it contributed to Jane feeling "stress and anxiety" over the summer.

4.  The district court properly dismissed Jane's NIED claim at the pleadings stage.  Under District law, NIED requires a relationship between the parties, or a special undertaking by the defendant, whose purpose or nature involves the defendant's caring for the plaintiff's emotional wellbeing.  The D.C. Court of

Appeals has held that the school-student relationship, without more, is *not* such a relationship. Jane argues that she alleged something more: that Principal James and the District agreed to undertake an investigation of the assault. But the complaint fails to allege such an affirmative undertaking, and in any event, the purpose or nature of a sexual assault investigation is not to care for the complainant's emotional wellbeing, but to discover the truth. Investigating a sexual assault will often require asking a complainant painful and invasive questions, making it untenable to impose on school officials a special tort duty to care for the complainant's emotional wellbeing.

## ARGUMENT

## I. The District Court Properly Granted Summary Judgment On Jane's Title IX Deliberate Indifference Claim.

Title IX's central command states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Supreme Court has held that this prohibition may be enforced by private parties through an implied right of action, under which damages are an available remedy. *See generally Cannon v. Univ. of Chi.*, 441 U. S. 677 (1979) (implying private right of action); *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60 (1992) (allowing damages). In two path-marking decisions, however, the Court carefully limited the circumstances in which

students can hold school districts liable for damages under Title IX based on sexual harassment, including sexual assault.

In *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998), the Court addressed damages liability for a teacher's sexual harassment of a student. The Court concluded that Title IX does not "permit a damages recovery against a school district for a teacher's sexual harassment of a student based on principles of *respondeat superior* or constructive notice." *Id.* at 285; *see id.* at 285-90. Instead, damages liability arises only where an "appropriate person" under 20 U.S.C. § 1682—that is, "an official of the recipient entity with authority to take corrective action" to stop the harassment—has actual notice of that harassment and responds with "deliberate indifference." *Gebser*, 524 U.S. at 290. "The premise, in other words, is an official decision by the recipient not to remedy the violation." *Id.*

In *Davis*, the Court built on *Gebser*'s principles to identify the narrow circumstances in which school districts are liable in damages for student-on-student sexual harassment. *First*, the sexual harassment must be "so severe, pervasive, and objectively offensive . . . that the victim-students are effectively denied equal access to an institution's resources and opportunities." 526 U.S. at 651. *Second*, the school district must have "actual knowledge" of that harassment. *Id.* at 650. *Third*, the school district must respond with deliberate indifference. *Id.* at 648. Deliberate indifference exists "only where the [funding] recipient's response to the harassment

or lack thereof is clearly unreasonable in light of the known circumstances." *Id.* This "is not a mere 'reasonableness' standard," *id.* at 649, and does not require school officials to "purg[e] their schools of actionable peer harassment or . . . engage in particular disciplinary action" to avoid liability, *id.* at 648. *Fourth*, the school district's deliberate indifference must then "'subject[]' its students to harassment." *Id.* at 644-45 (quoting 20 U.S.C. § 1681(a)). In other words, "the deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it." *Id.* at 645 (brackets in original) (quoting dictionary definitions of "subject"); *see id.* at 642-43 (funding recipients are "liable in damages only where their own deliberate indifference effectively 'cause[s]' the discrimination" (quoting *Gebser*, 524 U.S. at 291)).

Here, Jane's Title IX claim fails under *Davis* for at least two independent reasons. First, and most simply, even assuming that the District's response to Jane's assault amounted to deliberate indifference, that indifference did not cause Jane to undergo further harassment or make her liable or vulnerable to such harassment. Second, in fact, the District's response was not "clearly unreasonable" and thus did not constitute deliberate indifference.

### A. The District's response did not cause Jane to undergo further harassment or make her vulnerable to it.

As explained, under *Davis*, damages liability in a peer harassment case requires more than a school district's deliberate indifference to known and severe

sexual harassment. The school district's deliberate indifference itself must lead to a particular further harm: "the deliberate indifference must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it." *Id.* at 645 (cleaned up); *see Shank v. Carleton Coll.*, 993 F.3d 567, 576 (8th Cir. 2021) ("Linking the [school's] actions or inactions to emotional trauma the plaintiff experienced in the wake of sexual harassment or assault, even if proven, is not enough."). This requirement of further sexual harassment or vulnerability to such harassment, occurring *after* the school district has knowledge of the initial harassment, is necessary to ensure that the district is held liable "only for its own misconduct." *Davis*, 526 U.S. at 640.

Jane's opening brief acknowledges this requirement (Br. 2, 28-29) but makes no attempt to explain how it was met here. She has therefore forfeited any argument that it was, and the Court can affirm on that basis alone. *See Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019) ("A party forfeits an argument by failing to raise it in his opening brief.").

Even setting forfeiture aside, any such argument would lack merit. To begin, there is no evidence or even contention that M.P. (or anyone else) ever sexually harassed Jane again after the June 2017 assault in the bathroom. Indeed, Jane herself testified that "nothing like" that assault "happened again." JA 627.

Nor did the District's response make Jane "vulnerable to" further sexual harassment. To cause such vulnerability, a school district's response must at minimum make it likely that the victim will continue to encounter her harasser or otherwise suffer further harassment at school. *See, e.g.*, *Farmer v. Kan. State Univ.*, 918 F.3d 1094, 1097 (10th Cir. 2019) ("Plaintiffs have sufficiently alleged that KSU's deliberate indifference made each of them 'vulnerable to' sexual harassment by allowing their student-assailants—unchecked and without the school investigating—to continue attending KSU along with Plaintiffs."); *Karasek v. Regents of the Univ. of Cal.*, No. 15-CV-3717, 2015 WL 8527338, at *14 (N.D. Cal. Dec. 11, 2015) (vulnerability exists where victims "were forced to take drastic measures to avoid their assailants in the face of their respective schools' deliberate indifference"); *Doe ex rel. Doe v. Derby Bd. of Educ.*, 451 F. Supp. 2d 438, 447 (D. Conn. 2006) (school board made plaintiff "vulnerable to harassment" when it "allowed [her assailant] to remain in school exposing [plaintiff] to the potential for emotional encounters and harassment").[2]

---

[2] The Sixth Circuit has articulated the analogous concept in a teacher-student harassment case as requiring the plaintiff to show that "an objectively reasonable fear of further harassment caused the plaintiff to take specific reasonable actions to avoid harassment, which deprived the plaintiff of the educational opportunities available to other students." *Wamer v. Univ. of Toledo*, 27 F.4th 461, 471 (6th Cir. 2022).

But the District's response here did just the opposite. Superintendent Pinder swiftly agreed to let Jane transfer schools, *see supra* pp. 10-11, and as a backup DCPS proposed creating a "safety plan" that would entail "full separation" between Jane and M.P. if they both returned to Roosevelt, App. 342. Further, the District's response worked: Jane transferred schools and there is no evidence that she ever encountered M.P. again. No rational jury could conclude, then, that the District's response made Jane vulnerable to further sexual harassment.

Jane asserts that liability can arise "where the combined systemic effect of the sexual harassment and the school's response effectively denies the victim access to a scholastic program or activity," Br. 29—but this contention is doubly unpersuasive. For one, this nebulous theory of liability is inconsistent with *Davis*, which states unequivocally that the defendant's deliberate indifference "must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it." 526 U.S. at 645 (cleaned up). In any event, Jane fails to identify a scholastic program or activity to which she was denied access by the District's response to her assault. The only program- or activity-restriction that Jane's brief mentions is that, "[i]n September 2018, the District removed Jane from the cheerleading team because of her absences." Br. 18. That removal was in no sense "the school's response" to Jane's assault more than a year before. Wilson staff simply enforced the cheerleading team's rules about attending practice. App. 795, 799.

**B.    The District did not respond to Jane's assault with deliberate indifference.**

Alternatively, Jane's Title IX claim fails because the District was not deliberately indifferent.  Its response to Jane's assault was reasonable, and certainly not "clearly unreasonable."  Jane's arguments to the contrary lack merit.

1.    The District's response was not "clearly unreasonable."

In this context as in others, deliberate indifference "is a stringent standard of fault."  *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997) (addressing municipal liability under 42 U.S.C. § 1983); *see Davis*, 526 U.S. at 642 (noting that *Gebser* adopted "the 'deliberate indifference' theory already used to establish municipal liability under . . . 42 U.S.C. § 1983").  It neither requires school administrators to take any "particular disciplinary action" nor gives victims a "right to make particular remedial demands."  *Davis*, 526 U.S. at 648.  Deliberate indifference exists "only" where a school district's response "is *clearly unreasonable* in light of the known circumstances."  *Id.* (emphasis added).[3]

In applying this standard, the question is not—as Jane's brief implicitly supposes—whether a defendant behaved "unreasonabl[y]" in some generalized

---

[3]    Purporting to quote *Davis*, Jane asserts that the deliberate indifference standard "*does* [*not*] *require courts to conclude that 'minimal, ineffective, or belated efforts to respond to sexual harassment are not clearly unreasonable as a matter of law.*'"  Br. 29 (purportedly quoting 526 U.S. at 647 (emphasis added by Jane)); *see also* Br. 24 (same language in quotation marks).  Neither the quoted language nor any similar phrase appears anywhere in *Davis*.

sense.  Reasonableness must be measured against a specific goal: stopping the peer sexual harassment.  Damages liability, after all, requires a response so deficient as to equal "an official decision by the recipient not to remedy the violation," that is, the harassment.  *Id.* at 642 (quoting *Gebser*, 524 U.S. at 290).  Likewise, the point of the actual-notice standard is to give recipients "an opportunity to take action to end the harassment or to limit further harassment."  *Gebser*, 524 U.S. at 289; *see also* Emily Suski, *Subverting Title IX*, 105 Minn. L. Rev. 2259, 2296 (2021) ("Clearly unreasonable responses . . . are those responses that put students at risk for or indirectly cause further sexual harassment."); *id.* at 2294-96.  Accordingly, a response reasonably calculated *to prevent further harassment* is enough to defeat liability, even if the response seems unreasonable in some other sense.  Moreover, the subject of this focused reasonableness inquiry is the defendant's "response to the harassment," *Davis*, 526 U.S. at 648—*not* every subsequent action the defendant ever takes respecting the plaintiff.

Here, the District's response to Jane's assault was far from "clearly unreasonable."  After receiving Julie's email about the attack on the last day of the school year, Principal James promptly directed Roosevelt staff to call MPD, which they did.  *See supra* p. 5.  James and other Roosevelt administrators met in person with the Does that same afternoon to gather more information.  *See supra* pp. 5-7.  They then pulled the critical security footage and provided it to MPD.  *See supra* p.

7. Superintendent Pinder almost immediately agreed to let Jane transfer schools. *See supra* pp. 10-11. DCPS soon launched a Title IX investigation which substantiated Jane's allegations and proposed measures to ensure "full separation" between Jane and M.P. going forward. *See supra* pp. 8-10. And DCPS made good on Pinder's transfer offer, ultimately letting Jane transfer to her preferred school, Wilson. *See supra* p. 13. This response was a wholly reasonable effort to prevent Jane from suffering any further sexual harassment—and indeed a wholly successful one.

Nothing that occurred at Wilson months and years later transformed the District's response into one that was clearly unreasonable. Jane's core complaint about Wilson is that the staff mischaracterized some of her many absences as unexcused, including absences for therapy sessions related to the June 2017 assault. But even if Wilson did err in this respect, this misapplication of the attendance policy cannot plausibly constitute the District's "response to [M.P.'s] harassment" of Jane. *Davis*, 526 U.S. at 648. And even if it could, these attendance errors in no way made it more likely that Jane would suffer further sexual harassment. They were thus not remotely "an official decision by the [District] not to remedy" M.P.'s (or anyone else's) harassment of Jane. *Id.* at 642 (quoting *Gebser*, 524 U.S. at 290). Jane has not cited any decision of any court finding Title IX liability on facts similar to these, nor is the District aware of one.

2.     Jane's arguments about deliberate indifference lack merit.

Jane makes four arguments in support of her contention that the District responded to her assault with deliberate indifference.  Each lacks merit.

*First*, Jane asserts that Principal James "deliberately misconstrued the facts of the assault" to Superintendent Pinder, and that "because of these misrepresentations" Pinder "did not initiate or approve any kind of transfer for Jane until he viewed the video himself and listened to James's recorded statements from the June 14, 2017 meeting—two months after the assault occurred."  Br. 31.  Even viewed in the light most favorable to Jane, the record contradicts this contention.   Julie's secret recording reveals that Pinder had agreed to let Jane transfer out of Roosevelt *one day* after the assault.  Audio Recording 53:30 to 54:02.  By mid-July, Pinder had offered at least four transfer options.  App. 341, 688-90.  That the Does disliked these schools does not make the District's response clearly unreasonable.  The Does had no "right to make particular remedial demands" under either Title IX or District law.  *Davis*, 526 U.S. at 648.  Pinder's original transfer options, plus the fallback plan of "full separation" at Roosevelt, were already a reasonable method of preventing M.P. from harassing Jane further.  In short, even if the District had never authorized a transfer to Wilson in particular, its response still would not have constituted deliberate indifference.

Alternatively, even if the District had not given Jane any transfer options until offering the Wilson placement in August, that too would not have shown deliberate indifference. Again, the reasonableness inquiry is concerned with preventing future harassment at school. Where, as here, a school district learns of sexual harassment at the start of summer break, it is not clearly unreasonable for it to wait until school restarts to implement remedial measures. To be sure, Jane avers that she suffered "anxiety and stress" over the summer as she "wait[ed] and hope[d]" to get a transfer to one of her preferred schools. App. 665. But the mere fact that a school district's response causes a plaintiff distress does not establish deliberate indifference if there has been no risk of further harassment. In any event, emotional distress alone, unaccompanied by pecuniary injury, cannot support damages under Title IX because Title IX is Spending Clause legislation. *See Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 217-30 (2022); RD 88 (District's notice of supplemental authority explaining *Cummings*'s applicability).

*Second*, Jane argues that Roosevelt administrators failed to fully inform Milo Howard in DCPS's student placement office about the investigation, which purportedly "caused Howard to deny the Does['] transfer request initially, thereby contributing to the delay in determining Jane's fate for the following school year." Br. 32. This contention is both wrong and irrelevant. It is wrong because Howard had no unilateral authority to grant or deny a transfer or to approve a transfer to any

specific school.  *See* App. 677-78.  As explained, Superintendent Pinder authorized a transfer from the very start, which Howard neither could nor did countermand. *Supra* pp. 10-11.  And Howard played no role in DCPS's eventual decision to authorize a transfer to Wilson specifically.  App. 683.  In any event, the point is irrelevant because, as just explained, any "delay in determining Jane's fate for the following school year" does not amount to deliberate indifference (and is not compensable by damages anyway).

*Third*, Jane contends that DCPS's Title IX resolution letter substantiating her complaint (App. 341-42) was not properly disseminated to DCPS officials, most notably Wilson's administrators.  Br. 32-33.  "Because Wilson did not have the letter," says Jane, "the administrators there began marking [her] absent immediately starting her sophomore year."  Br. 33.  This contention does not make sense.  The letter did not authorize Jane to be absent at particular times or for particular reasons; it did not mention absences at all.  *See* App. 341-42.  Insofar as Jane was absent for documented medical appointments (including therapy), those absences should have been excused.  App. 587 (DCPS representative: "[I]n normal circumstances when a student is marked absent because of a medical issue, it should be excused.").  But that was true regardless of whether DCPS substantiated her complaint against M.P. and said so in the Title IX resolution letter.  Legitimate medical appointments of *any* kind, whether or not related to an in-school incident, should have been excused.  In

any event, as explained earlier, the alleged attendance errors did not make it more likely that Jane would suffer further sexual harassment, and thus did not make the District's response to her assault clearly unreasonable in the relevant sense.

*Fourth*, Jane complains that DCPS never disciplined M.P. Br. 33. But that is not enough to make the District's response clearly unreasonable. Title IX's purpose is remedial, not punitive. It imposes no freestanding obligation to punish sexual harassers. Instead, the reason that discipline can be relevant under Title IX is that it is often a useful "action to end the harassment or to limit further harassment." *Gebser*, 524 U.S. at 289. But if a school district adequately protects against further harassment through other measures, the failure to discipline the harasser is immaterial under Title IX—even if it seems "unreasonable" in a broader sense of that term. As noted, the District took reasonable (and ultimately successful) measures to ensure that Jane would not encounter M.P. again. That is enough to preclude liability.

There is no evidence, moreover, that the District's failure to discipline M.P. affected Jane in any way during her time in DCPS. By her own account, she was not even aware "that he was still within the District's school system." Br. 33. Nor does her declaration mention the lack of discipline. *See* App. 664-66. In short, the failure to discipline M.P., while unfortunate, did nothing to restrict "the equal access to education that Title IX is designed to protect." *Davis*, 526 U.S. at 652.

**II.  The District Court Properly Granted Summary Judgment On Jane's Title IX Retaliation Claim.**

"Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005).  The district court held, and Jane agrees, that Title VII's retaliation framework applies to Title IX.  App. 1147-48; Br. 36-37.  A retaliation claim thus has three elements: (1) the plaintiff made a charge or opposed a practice made unlawful by Title IX; (2) the defendant took a materially adverse action against her; and (3) the defendant took the action because of her protected conduct.  *See Allen v. Johnson*, 795 F.3d 34, 38-39 (D.C. Cir. 2015) (Title VII).  The third element requires "proof that the desire to retaliate was the but-for cause of the challenged [adverse] action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013) (Title VII).

Unlike Title VII, however, which expressly defines "employer" to include "any agent" of an employer, 42 U.S.C. § 2000e(b), Title IX does not permit vicarious liability for damages based on agency principles, *see Gebser*, 524 U.S. at 284-90.  This means that retaliation by an individual school district employee—just like sexual harassment by such an employee—is not actionable unless the *school district* has actual knowledge of the retaliation and is deliberately indifferent.  *See, e.g., Garrett v. Ohio State Univ.*, 60 F.4th 359, 367 (6th Cir. 2023); *Saphir ex rel. Saphir v. Broward Cnty. Pub. Sch.*, 744 F. App'x 634, 639-40 (11th Cir. 2018); *Sherman v.*

*Regents of Univ. of Cal.*, No. 20-CV-6441, 2022 WL 1137090, at \*13 (N.D. Cal. Apr. 18, 2022). Notably, in judging the school district's knowledge, "the knowledge of the wrongdoer himself is not pertinent." *Gebser*, 524 U.S. at 291. That is true even if the wrongdoer is a principal or administrator who in other circumstances would be an "appropriate person" with corrective authority. *See M.S. ex rel. Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125-28 (3d Cir. 2020) (assistant principal's knowledge of his own discrimination could not create damages liability); *Salazar v. S. San Antonio Indep. Sch. Dist.*, 953 F.3d 273, 276-85 (5th Cir. 2017) (same for principal).

The District does not dispute that Jane twice engaged in protected activity satisfying the first element of a retaliation claim: reporting M.P.'s assault in June 2017, and filing this lawsuit in September 2018. On appeal, Jane points to seven actions or inactions that she contends were prohibited retaliation—most of which she never described as retaliation in the district court. *See* Br. 37-40; *cf.* RD 71 at 28-32 (Jane's retaliation arguments in the district court). All seven are either forfeited, meritless, or both.

*First*, Jane points to Principal James's secretly recorded "remarks at the June 14, 2017 meeting." Br. 39. But these remarks, even if "inappropriate" and "ugly," App. 1151, do not qualify as retaliation for three independent reasons. To start, the record refutes that "the but-for cause" of the remarks was "the desire to retaliate"

against Jane. *Nassar*, 570 U.S. at 352. It is undisputed that James did not want or expect Jane to hear these comments, App. 369, so James cannot have intended them to be retaliatory. To be sure, private comments can be *evidence* that some *other* act was retaliatory, but Jane's assertion here is that the comments themselves were the retaliation. That theory fails for lack of retaliatory intent.[4]

In addition, as the district court explained, James's comments were not severe enough to qualify as a materially adverse action. App. 1151-52 (citing *Baloch v. Kempthorne*, 550 F.3d 1191 (D.C. Cir. 2008)). In *Baloch*, which Jane's brief fails to even mention, this Court noted that "sporadic verbal altercations or disagreements do not qualify as adverse actions for purposes of retaliation claims." 550 F.3d at 1199. The Court held that multiple instances of a boss's "profanity-laden yelling," *id.*, including on one occasion "threaten[ing] to have Baloch arrested, led out of the building in handcuffs, and jailed," *id.* at 1195, fell short of "the requisite level of regularity or severity to constitute material adversity," *id.* at 1199. By extension, then, and even accounting for context, James's much more limited comments also fell short.

---

[4]     Even if James's comments are evidence that she called MPD with retaliatory intent, that argument goes nowhere. Calling MPD was not a materially adverse action but rather the undisputedly proper response to Jane's report of a sexual assault. As the district court correctly noted, doing the right thing, even if for the wrong reason, is not retaliation. App. 1152.

Finally, when Superintendent Pinder learned of James's comments—at which point the District gained actual knowledge under *Gebser*—he did not act with deliberate indifference. On the contrary, he immediately filed an incident report, triggering a DCPS investigation of James's conduct, which led to an official reprimand. App. 637-40, 644. Thus, even if James's comments otherwise qualified as retaliation, the District did not make "an official decision . . . not to remedy the violation"—the necessary predicate for damages liability. *Gebser*, 524 U.S. at 290.

*Second*, Jane asserts that "James mischaracterized the [security] video to Pinder." Br. 38. Jane did not identify this as a retaliatory act in the district court, so the contention is forfeited. *See, e.g.*, *Parada v. Banco Indus. De Venezuela, C.A.*, 753 F.3d 62, 70 (2d Cir. 2014) (applying forfeiture to specific instances of alleged retaliation). In any event, it lacks merit. Jane had no knowledge of James's alleged mischaracterization of the video to Pinder, so it could not possibly have dissuaded someone in her position from making a charge of discrimination—and thus was not a materially adverse action. In addition, there is no evidence that James mischaracterized the video because of a desire to retaliate against Jane. And finally, as with the secret recording, once Pinder learned of James's mischaracterization of the video, he did not act with deliberate indifference but instead promptly flagged the issue for DCPS in his incident report, which led to James being reprimanded. App. 639-40.

*Third*, Jane says James "failed to provide her or her staff's conclusions of the investigation to Howard when requested." Br. 38. This contention was not raised below and so is forfeited. It is also contradicted by the record. Howard wanted "to know the outcome of the MPD investigation." App. 687. James therefore asked a member of her staff for "an update," and the staff member related that "[t]he case was presented to the Attorney General and they declined prosecution." App. 686. Nothing about this interaction was retaliatory in any respect.

*Fourth*, Jane points to "the continuous marking of unexcused absences between September 2018 and September 2019, once Wilson became aware of Jane's assault." Br. 39. But Jane neither develops an argument nor cites any authority suggesting that mere attendance errors qualify as materially adverse actions. In any event, there is no evidence that the cause of any such errors was a desire to retaliate against Jane. On the contrary, by Jane's own account, Wilson staff were making the very same sorts of attendance errors during her sophomore year, before they knew she had been assaulted. Br. 17; App. 665.

*Fifth*, Jane points to "Principal Martin's failure to take any steps to correct Jane's academic record once she became aware that Jane was a sexual assault victim around September 2018." Br. 39. Yet again, this supposed retaliation was not raised below and so is forfeited. It is also difficult to comprehend. Jane does not explain what "correct[ion]" of her "academic record" would be justified by having been the

victim of a sexual assault, and the District is aware of none. This cryptic assertion is fatally underdeveloped. *See, e.g.*, *City of Waukesha v. EPA*, 320 F.3d 228, 250 n.22 (D.C. Cir. 2003) (argument raised "only summarily, without explanation or reasoning," was waived).

*Sixth*, Jane says that two teachers, Ms. Ward and Mr. Hartberger, accused her of "using her sexual assault to get out of school." Br. 39; *see* App. 498, 623. Once again, these incidents were not raised below as a form of retaliation and so are forfeited. The argument also lacks merit. These stray comments were not severe enough to be materially adverse actions. There is no evidence the teachers made them with retaliatory intent. And, regardless, there is no evidence that any "appropriate person" had actual notice of these comments, let alone responded with deliberate indifference.

*Seventh*, Jane points to the Wilson "security guard's remarks concerning Jane's lawsuit." Br. 39; *see* App. 623. Again, this point is forfeited. The comment likewise falls short of a materially adverse action, and there is no evidence of retaliatory intent. Moreover, when Jane reported this comment, DCPS had the guard "replaced due to breach of student confidentiality." App. 795. That is not deliberate indifference.

## III. The District Court Properly Granted Summary Judgment On Jane's Claim Of Intentional Infliction Of Emotional Distress.

Under District law, the tort of IIED requires proof of (1) "extreme and outrageous" conduct by the defendant which (2) intentionally or recklessly (3) causes the plaintiff "severe emotional distress." *E.g.*, *Sere v. Grp. Hospitalization, Inc.*, 443 A.2d 33, 37 (D.C. 1982). Neither Principal James's secretly recorded comments during the June 2017 meeting nor her conduct thereafter can satisfy this test.

### A. Principal James's comments during the June 2017 meeting do not support liability.

James's secretly recorded comments, made when the Does were out of the room during the June 2017 meeting, are insufficient to sustain Jane's IIED claim for at least two independent reasons.

*First*, as the district court correctly held, James's comments were not made with the requisite intent. App. 1164. To be liable for IIED, a defendant must have either *intended* to cause severe emotional distress or been *reckless* as to that result— that is, acted in deliberate disregard of a high probability of causing severe emotional distress. Restatement (Second) of Torts § 46 cmt. i (Am. L. Inst. 1965). It is undisputed, however, that James did not want or expect Jane to hear these comments. App. 369. She therefore lacked intent. And for good reason Jane has never

suggested that James was reckless; James had no reason to anticipate (let alone think it highly probable) that Julie was secretly recording the meeting.

Jane's response lacks merit. She notes that courts have held that intent can be inferred from the outrageousness of a defendant's conduct. Br. 40-41 (citing *Waldon v. Covington*, 415 A.2d 1070, 1077 (D.C. 1980)). That is certainly true in some cases: if a defendant behaves atrociously to a plaintiff's face, it may be reasonable to infer that the defendant intended the plaintiff's resulting suffering. But the principle cannot logically apply to secretly recorded comments that the defendant could not have expected the plaintiff to ever hear. No matter how outrageous or abhorrent such comments might be, they provide no evidence of the requisite intent.

*Second*, while inappropriate, James's comments were not extreme and outrageous under District law. To satisfy this element, the defendant's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Carey v. Edgewood Mgmt. Corp.*, 754 A.2d 951, 955 (D.C. 2000) (internal quotation marks omitted). Liability does not arise from "mere insults, indignities, [or] threats," nor from "occasional acts that are definitely inconsiderate and unkind." Restatement (Second) of Torts § 46 cmt. d. "No pressing social need requires that every abusive outburst be converted into a tort." *Harris v. Jones*, 380 A.2d 611, 615 (Md. 1977) (quoting Calvert Magruder, *Mental*

*and Emotional Disturbance in the Law of Torts*, 49 Harv. L. Rev. 1033, 1053 (1936)); *see* Restatement (Second) of Torts § 46 cmt. d (similar, citing Magruder).

At most, Principal James's comments amounted to an angry outburst that was inconsiderate and unkind. *See supra* p. 6 (reproducing James's comments). Although it was improper to assume that Jane's allegation was "bullshit," James did not yet know there was corroborating evidence. And critically, she made these comments in private, not to or in front of Jane. That fact is a key distinction (among many others) between this case and Jane's principal authority, *Drejza v. Vaccaro*, 650 A.2d 1308 (D.C. 1994).

In *Drejza*, "only an hour or so after [the plaintiff] had been raped," a police detective subjected her to a "humiliat[ing]" interview in which he "ridiculed her complaint" and "treated her with derision." *Id.* at 1309, 1317. According to the plaintiff, the detective "repeatedly smirked at her account, acted as though her ordeal was insignificant and her complaints were unreasonable, bullied her into (initially) not pressing charges," and threw her torn underwear—brought to the interview as evidence—back at her, "telling her to 'take your little panties home with you.'" *Id.* at 1310, 1317. The detective then ridiculed her *again* in a second interview, "jok[ing] about Ms. Drejza's 'marital hymen' and laugh[ing] at her because she was not a virgin." *Id.* at 1316. The court held that the totality of this alleged conduct,

which was "*directed at* a woman whose world ha[d] just been turned upside down," could qualify as extreme and outrageous. *Id.* at 1317 (emphasis added).

The facts here are not at all "similar" to those in *Drejza*. Br. 44. The detective in *Drejza* "directed at" the plaintiff an extended stream of scorn, repeatedly mocking her to her face. Even so, the court considered the issue "a difficult one," 650 A.2d at 1309, and one judge "vehemently" dissented, *id.* at 1318 (Terry, J.). Principal James, in contrast, made a limited number of inappropriate remarks—and did so *in private*. Unlike the officer in *Drejza*, she also called in unbiased authorities from another agency and requested a proper investigation to address the Does' concerns. App. 307, 367. As a matter of law, James's private remarks are not the type of "major outrage" that "is essential to the tort." *Drejza*, 650 A.2d at 1313 n.15 (quoting Restatement (Second) of Torts § 46 cmt. f).

### B.   Principal James's subsequent conduct does not support liability.

Jane also tries to ground her IIED claim in Principal James's conduct after the June meeting. Specifically, she contends that James "mischaracteriz[ed]" the assault to Pinder and "fail[ed] to provide candid information to Howard about the assault." Br. 48. This "caused a delay in Jane securing a transfer from [Roosevelt], which caused her further psychological harm." Br. 48. This set of events, however, satisfies *none* of the elements of IIED.

*First*, this conduct was not extreme and outrageous. As explained, James's response to Howard's request for information was both entirely appropriate and utterly inconsequential. *See supra* p. 43. James's alleged mischaracterization of the video to Pinder, if true, was improper. But that is not enough. "The requirement of outrageousness is not an easy one to meet." *Drejza*, 650 A.2d at 1312. In *Kerrigan v. Britches of Georgetowne, Inc.*, 705 A.2d 624 (D.C. 1997), for example, the D.C. Court of Appeals dismissed as insufficient the plaintiff's allegations (presumed to be true) that the defendant "targeted him for a sexual harassment investigation, manufactured evidence against him in order to establish a false claim of sexual harassment, leaked information from the investigation to other employees, and unjustifiably demoted him to the position of store manager in order to promote a woman to his position." *Id.* at 628. If that conduct falls short of extreme and outrageous, so does James's.

*Second*, there is no evidence that James intended to inflict severe emotional distress on Jane. Indeed, it is hard to see how James could have possibly thought that this conduct—which was not directed at, or apparent to, Jane—would have such an effect on her. That is particularly so given that James knew that Pinder had already offered to let Jane transfer out of Roosevelt. Audio Recording 53:30 to 54:10.

*Third*, there is no evidence that this conduct in fact caused Jane to suffer severe emotional distress. The effect of this conduct, according to Jane, was to delay the decision to let her transfer to Wilson, "which caused her further psychological harm." Br. 48. But the only evidence about that *particular* psychological harm— as distinct from the harm caused by the sexual assault itself and by hearing James's recorded comments—is Jane's one-sentence assertion that she felt "anxiety and stress" over the summer. App. 665. That is insufficient. The "case law sets a high standard, requiring emotional distress of so acute a nature that harmful physical consequences might be not unlikely to result. Recovery is not allowed merely because conduct causes mental distress." *Ortberg v. Goldman Sachs Grp.*, 64 A.3d 158, 164 (D.C. 2013) (cleaned up). The tort is instead aimed at "conduct intended or likely to cause physical illness." *Id.* (internal quotation marks omitted). Thus, in a case about an acrimonious dispute between neighbors, the plaintiff was left "horrified," "shaken," "embarrassed," and even "constantly crying and almost sleepless"—yet this did not meet the IIED standard. *Wood v. Neuman*, 979 A.2d 64, 78 (D.C. 2009). Nor does Jane's bare declaration of "anxiety and stress."

## IV. The District Court Properly Dismissed Jane's Claim Of Negligent Infliction Of Emotional Distress.

The district court dismissed Jane's NIED claim against the District and James at the pleading stage. App. 901-03. That dismissal should be affirmed. Jane's

relationship with the District and James was, as a matter of law, not one that can support an NIED claim.

Historically, recovery for NIED was allowed only "if the defendant's actions caused the plaintiff to be in danger of physical injury and if, as a result, the plaintiff feared for his own safety," a scenario not present here. *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 796 (D.C. 2011) (en banc) (internal quotation marks omitted). In *Hedgepeth*, however, the D.C. Court of Appeals expanded NIED to include cases "where the defendant has an obligation to care for the plaintiff's emotional well-being or the plaintiff's emotional well-being is necessarily implicated by the nature of the defendant's undertaking to or relationship with the plaintiff." *Id.* at 792. The quintessential example of a relationship that could (but would not always) satisfy this test is the doctor-patient relationship. *Id.* at 813. A "hospital's false report of death or a funeral home's mishandling of a corpse" might also be actionable, because the hospital and funeral home "implied[ly]" "undertook to care for the emotional well-being of the deceased's widow, parent or child." *Id.* at 814. But "many other relationships, even if they involve fiduciary obligations, generally will not come within the rule, *because neither the purpose of the relationship nor the fiduciary's undertaking is to care for the plaintiff's emotional well-being*." *Id.* at 815 (emphasis added). Thus, "[t]he *purpose* of the relationship must involve care for another's emotional well-being." *Lesesne v. District of*

*Columbia*, 146 F. Supp. 3d 190, 196 (D.D.C. 2015).  Whether such a relationship exists "is a determination of law for the court."  *Sibley v. St. Albans Sch.*, 134 A.3d 789, 798 (D.C. 2016).

Critically, under District law, the school-student relationship is *not* a relationship that meets the NIED standard.  The D.C. Court of Appeals so held in *Sibley*: "The relationship between a student and his school or the musical director of his choir program is not enough, without more, to impose the predicate duty of care for a claim of negligent infliction of emotional distress."  *Id.* at 798.  Jane tries to evade this holding by arguing that "the duty in [*Sibley*] was governed by a contract between the plaintiff and the defendants," making *Sibley* "inapposite here."  Br. 53. That is incorrect.  The court's later reference to the parties' contract in *Sibley* related *not* to the duty element of NIED, but to the breach element—that is, whether the school's "decision not to permit [the student] to re-enroll . . . was negligent."  134 A.3d at 798.

Jane also errs in relying on *District of Columbia v. Royal*, 465 A.2d 367 (D.C. 1983), and Section 46 of the Restatement (Third) of Torts.  Br. 50, 53.  *Royal* was a traditional negligence case involving *physical* injury; it says nothing pertinent to NIED.  And Section 46 of the Restatement addresses *intentional* infliction of emotional distress, so it too is irrelevant.  The governing law comes instead from

*Sibley*, under which a school-student relationship "is not enough, without more," to state a claim for NIED. 134 A.3d at 798.

Jane argues that she alleged something "more" here: "an 'undertaking' by the Defendants to investigate Jane's report of sexual assault." Br. 52. This argument has two flaws. To begin, the complaint does not in fact allege that James or any other DCPS official agreed or promised to undertake an investigation. On this point, Jane blockquotes numerous paragraphs of the complaint, Br. 51-52, but fails to identify anything relevant therein.

But even if Jane had adequately alleged such an undertaking, that would still be legally insufficient. Under District law, either "the purpose of the relationship" or the "undertaking [must be] to care for the plaintiff's emotional well-being." *Hedgepeth*, 22 A.3d at 815. Unlike the services provided by a doctor or a funeral director, neither the purpose nor the nature of a sexual assault investigation is to care for the complainant's emotional well-being; it is to discover the truth. Indeed, discovering the truth will often require school officials to ask a complainant painful and invasive questions that might cause emotional distress. And school officials also have responsibilities to an alleged perpetrator, who may give a conflicting account. To impose on school officials a special tort duty in these trying circumstances would be burdensome and illogical—and finds no support in case law.

As the district court correctly explained, this case is distinguishable from *Cavalier v. Catholic University of America*, 306 F. Supp. 3d 9 (D.D.C. 2018) (cited at Br. 53). App. 902-03. In *Cavalier*, a university ordered an accused sexual assailant, Doe, to have no contact with the plaintiff victim, Cavalier. 306 F. Supp. 3d at 23-24. Cavalier alleged that when Doe repeatedly violated the no-contact order, the university did nothing. *Id.* at 24. The court held that Cavalier's NIED claim could proceed "to the extent she challenges the University's failure to enforce its no-contact order." *Id.* at 40.

> [B]y affirmatively representing to Cavalier that a no-contact order was in place between her and Doe and that, should Cavalier report Doe's violations of that order, it would take the necessary steps to enforce it, the University knew, or should have known, that it was "undertaking" an obligation in a "situation[] where the emotional well-being of [Cavalier] [wa]s at the core" of its responsibility.

*Id.* (quoting *Hedgepeth*, 22 A.3d at 814) (citation omitted). In contrast, Jane's complaint did not allege that James or the District engaged in any similar protective undertaking that entailed caring for Jane's emotional wellbeing. Her NIED claim was therefore properly dismissed.

# CONCLUSION

The district court's judgment should be affirmed.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

/s/ Graham E. Phillips
GRAHAM E. PHILLIPS
Deputy Solicitor General
Bar Number 1035549
Office of the Solicitor General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6656
May 2024                           graham.phillips@dc.gov

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 12,926 words, excluding exempted parts. This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

/s/ Graham E. Phillips
GRAHAM E. PHILLIPS